No. 22-2203

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

DANIEL BADER,

*Plaintiff-Appellant,*

v.

UNITED STATES,

*Defendant-Appellee.*

Appeal from the United States Court of Federal Claims,
No. 21-1501C

# PLAINTIFF-APPELLANT'S OPENING BRIEF

CARTER G. PHILLIPS
JILLIAN SHERIDAN STONECIPHER
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000

CAROLINE A. WONG
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000

*Counsel for Plaintiff-Appellant Daniel Bader*

# CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant Daniel Bader certifies:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

   Daniel Bader

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

   Not Applicable.

3. **Parent Corporation and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. Fed. Cir. R. 47(a)(3).

   Not Applicable.

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

   Sean C. Timmons and Larry D. Youngner (Tully Rinckey, PLLC); Lt. Colonel Julie Pitvorec.

5. **Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5).

   None.

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

Not Applicable.

December 14, 2022

*/s/ Jillian Sheridan Stonecipher*
JILLIAN SHERIDAN STONECIPHER
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000

*Counsel for Plaintiff-Appellant Daniel Bader*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .......... i

TABLE OF AUTHORITIES .......... v

STATEMENT OF RELATED CASES .......... viii

INTRODUCTION .......... 1

JURISDICTIONAL STATEMENT .......... 3

STATEMENT OF THE ISSUES .......... 4

STATEMENT OF THE CASE .......... 5

A. Colonel Bader's Service .......... 5

B. Military Approval of Colonel Bader's Civilian Employment .......... 8

C. Colonel Bader's Civilian Employment .......... 12

D. The Inspector General Investigation and Letter of Reprimand .......... 15

E. The Retirement Grade Determination .......... 22

F. Termination of the Debarment Action .......... 23

G. The Correction Board Decisions .......... 24

H. The Court of Federal Claims .......... 34

SUMMARY OF ARGUMENT .......... 37

ARGUMENT .......... 38

I. STANDARD OF REVIEW ........ 40

II. THE CORRECTION BOARD'S DECISIONS WERE ARBITRARY AND CAPRICIOUS ........ 40

A. The Correction Board Ignored Colonel Bader's Argument That Representing A Civilian Employer To An Agency Where One Serves Part-Time Cannot Itself Constitute Misuse Of Public Office ........ 41

B. The Correction Board Ignored the Argument that Colonel Bader's Actions Were Permitted Pursuant to Other Transaction Authority ........ 48

C. The Correction Board Failed to Consider Key Portions of Russo's Letter ........ 49

II. THE CORRECTION BOARD'S DECISIONS WERE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ........ 50

CONCLUSION ........ 57

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ........ 43

*Bailey v. United States*,
516 U.S. 137 (1995), *superseded by statute on other grounds*, Pub. L. No. 105-386, 112 Stat. 3469 (1998), *as recognized in Welch v. United States*, 578 U.S. 120 (2016) ........ 52

*Baude v. United States*,
955 F.3d 1290 (Fed. Cir. 2020) ........ 2, 39, 40, 43, 50

*Chisolm v. United States*,
41 F. App'x 394 (Fed. Cir. 2002) ........ *passim*

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) ........ 47

*Dickinson v. Zurko*,
527 U.S. 150 (1999) ........ 40

*Dickson v. Sec'y of Def.*,
68 F.3d 1396 (D.C. Cir. 1995) ........ 44, 45, 48

*Fisher v. United States*,
402 F.3d 1167 (Fed. Cir. 2005) ........ 3, 40

*Fuentes v. United States*,
157 Fed. Cl. 433 (2021) ........ 40

*Haskins v. United States*,
51 Fed. Cl. 818 (2002) ........ 4

*Hinck v. United States*,
550 U.S. 501 (2007) ........ 42

*Jenkins v. Speer*,
258 F. Supp. 3d 115 (D.D.C. 2017) .......... 39

*Kelly v. United States*,
826 F.2d 1049 (Fed. Cir. 1987) .......... 53

*Martinez v. United States*,
333 F.3d 1295 (Fed. Cir. 2003) .......... 3, 4

*Miller v. Off. of Pers. Mgmt.*,
903 F.3d 1274 (Fed. Cir. 2018) .......... 53

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 39, 47

*Piotrowski v. United States*,
No. 13-760C, 2014 WL 7476033 (Fed. Cl. Dec. 30, 2014), *aff'd*, 722 F. App'x 982 (Fed. Cir. 2018) .......... 4

*Roth v. United States*,
378 F.3d 1371 (Fed. Cir. 2004) .......... 2, 38, 40

*Schussler v. United States*,
152 Fed. Cl. 207 (2021), *appeal docketed*, No. 21-1819 (Fed. Cir. Apr. 2, 2021) .......... 39

*Sphatt v. Dep't of Homeland Sec.*,
853 F. App'x 653 (Fed. Cir. 2021) .......... 54

*Walls v. United States*,
582 F.3d 1358 (Fed. Cir. 2009) .......... 38

*Waters v. United States*,
139 Fed. Cl. 9 (2018), *aff'd*, 774 F. App'x 640 (Fed. Cir. 2019) .......... 3

**Statutes and Regulations**

10 U.S.C. § 1370 .......... 23

10 U.S.C. § 1370(a)(1) .......... 3, 23

10 U.S.C. § 1370(a)(2) .......... 23

10 U.S.C. §§ 1551-1559 .......... 24

10 U.S.C. § 1552(a) .......... 24

10 U.S.C. § 1552(c)-(d) .......... 25

10 U.S.C. § 4021 .......... 14

10 U.S.C. § 4022 .......... 14

10 U.S.C. § 9329 .......... 3

10 U.S.C. § 12301 .......... 8

18 U.S.C. § 203 .......... 46

18 U.S.C. § 205 .......... 46

18 U.S.C. § 207 .......... *passim*

28 U.S.C. § 1295(a)(3) .......... 4

28 U.S.C. § 1491(a) .......... 3, 4

5 C.F.R. § 2635.101(b)(14) .......... 54, 55, 56

5 C.F.R. § 2635.502 .......... 55

5 C.F.R. § 2635.702 .......... *passim*

32 C.F.R. § 865.1 .......... 24

**Other Authorities**

Air Force Rsrv. Command, *Glossary of Military & Reserve Terminology*, https://www.afrc.af.mil/About-Us/Fact-Sheets/Display/Article/156010/glossary-of-military-reserve-terminology/ .......... 10

*Oxford Dictionaries Pro* (2012) .......... 51

*Webster's New International Dictionary* (2d ed. 1939) .......... 51

## STATEMENT OF RELATED CASES

No other appeal in or from the same civil action or proceeding is or was previously before this or any other appellate court.

# INTRODUCTION

After decades of exemplary service in the U.S. Military, Colonel Daniel Bader was promoted to the rank of brigadier general. In that rank, he served in the State of New York's Air National Guard in a part-time position and was therefore permitted also to obtain work as a civilian. The National Guard issued ethics opinions to Colonel Bader telling him he could work as a government contractor while in a part-time status, as long as he complied with certain restrictions on representations he could make to the military on behalf of his civilian employer, specifically those in 18 U.S.C. § 207.

Years later, however, the military disciplined Colonel Bader and retired him at a lower rank for doing what the ethics opinions told him was permissible: maintaining his part-time military role and making representations to the military as a government contractor consistent with the restrictions in 18 U.S.C. § 207. The military found this conduct violated an ethics regulation—5 C.F.R. § 2635.702—not mentioned in the ethics opinions. As a result, the military formally reprimanded Colonel Bader and retired him at the lower rank of colonel. The Air

Force Board for Correction of Military Records ("Correction Board") upheld those decisions.

That result is indefensible. Congress has authorized part-time military officers acting as civilians to make representations to their agencies on behalf of civilian employers, as the ethics advice provided to Colonel Bader correctly told him. *See* 18 U.S.C. § 207. The military's decision to discipline Colonel Bader for making such representations is irreconcilable with Congress's determination. It is also unprecedented. The military has identified no record of taking any similar action against any other officer for "fact patterns that substantially mirror those in this case."

There is a reason for this remarkable result: the Correction Board failed to meaningfully consider crucial evidence or respond to Colonel Bader's key arguments. Its decisions were arbitrary and capricious, contrary to law, and unsupported by substantial evidence, and they cannot stand. *See Baude v. United States*, 955 F.3d 1290, 1293 (Fed. Cir. 2020); *Roth v. United States*, 378 F.3d 1371, 1381 (Fed. Cir. 2004). Colonel Bader should be restored to the rank of a retired brigadier general and awarded backpay.

## JURISDICTIONAL STATEMENT

The United States Court of Federal Claims had jurisdiction over this case under 28 U.S.C. § 1491(a) and 10 U.S.C. §§ 1370(a)(1), 9329.

In particular, under 28 U.S.C. § 1491(a), the Court of Federal Claims has jurisdiction over actions in which a plaintiff seeks monetary damages against the United States pursuant to a "money-mandating" statute. *See, e.g.*, *Martinez v. United States*, 333 F.3d 1295, 1302–03 (Fed. Cir. 2003) (en banc). A statute is "money-mandating" if it "can fairly be interpreted as mandating compensation for damages sustained as a result of the breach of the duties [it] impose[s]." *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005).

Here, Colonel Bader seeks relief under 10 U.S.C. § 1370(a)(1), which provides that a commissioned Air Force officer "shall be retired in the highest permanent grade in which such officer is determined to have served on active duty satisfactorily," and under 10 U.S.C. § 9329, which provides that a retired Air Force officer is "entitled to retired pay." Both statutes are money-mandating statutes supporting jurisdiction. *See, e.g.*, *Waters v. United States*, 139 Fed. Cl. 9, 18 (2018) (addressing § 1370), *aff'd*, 774 F. App'x 640 (Fed. Cir. 2019) (per

curiam); *Piotrowski v. United States*, No. 13-760C, 2014 WL 7476033, at *8–9 (Fed. Cl. Dec. 30, 2014) (addressing § 9329, then codified at 10 U.S.C. § 8929), *aff'd*, 722 F. App'x 982 (Fed. Cir. 2018); *see also* Appx23.

Because the Court of Federal Claims had jurisdiction over Colonel Bader's claim for monetary relief, it had jurisdiction over his claims for other relief, which are "an incident of and collateral to" his requested monetary relief. 28 U.S.C. § 1491(a)(2); *see also, e.g.*, *Martinez*, 333 F.3d at 1302–03; *Haskins v. United States*, 51 Fed. Cl. 818, 822–23 (2002).

The Court of Federal Claims entered final judgment on July 6, 2022. Appx1. Colonel Bader filed a notice of appeal on September 2, 2022. Appx693. This Court has jurisdiction under 28 U.S.C. § 1295(a)(3).

## STATEMENT OF THE ISSUES

**1.** Whether the Court of Federal Claims erred when it found that the Correction Board's decisions were not arbitrary and capricious, despite the fact that the Correction Board failed to address:

(1) Colonel Bader's argument that the Inspector General erred in finding that Colonel Bader misused his public office by

performing military and civilian roles he was permitted by law to perform,

(2) Colonel Bader's argument that the Inspector General erred by finding Colonel Bader misused his public office through acts that were entirely lawful and customary pursuant to Other Transaction Authority, and

(3) evidence that a key witness's statements were misinterpreted by the Inspector General.

**2.** Whether the Court of Federal Claims erred by finding the Correction Board's decisions supported by substantial evidence.

## STATEMENT OF THE CASE

### A. Colonel Bader's Service

After graduating from the U.S. Air Force Academy, Colonel Bader served as an active duty military officer for more than 25 years, including 12 years as an active duty Air Force officer and 13 years as an active duty member of the Air National Guard. Appx95.

As a fighter pilot, Colonel Bader flew 58 combat missions, including missions in Bosnia, Kuwait, and Iraq, where he faced enemy fire. Appx114, Appx122, Appx143-144. His service contributed to the

detainment of "key Al Qaida leaders." Appx122. Outside the cockpit, he was recognized for "dynamic leadership, exemplary performance, and steadfast drive for excellence." Appx121. Colonel Bader was consistently recommended for promotion and described by senior officers as "best in command" and "one of [the] finest officers" they supervised. Appx126; *see also* Appx128 ("My top officer—bar none"); Appx 130 ("Solid gold performer … Top Colonel."); Appx131 ("Unsurpassed … [M]y finest Colonel"); Appx133 ("Top 1% Colonel"); Appx137 ("My Best"); Appx139 ("One of my finest officers").

Colonel Bader has received the Legion of Merit, the Meritorious Service Medal, the Joint Service Achievement Medal, the Air Medal, and numerous other medals and awards for his service. Appx117, Appx121-125.

Colonel Bader met his wife, also a now-retired Air Force colonel, while he was training to serve as a fighter pilot and she was in medical officer training. Appx143, Appx151. Both of their sons are military officers and graduates of service academies. Appx151, Appx144.

Colonel Bader's supervisors and colleagues described him as "honest," "with the highest ethical standards." Appx227, Appx264

(letter by a retired Air Force Major General who supervised Colonel Bader). One supervisor described him as "an extremely honest person with the utmost reliability and loyalty to his peers, his co-workers and the US Government." Appx258.

In 2010, Colonel Bader was promoted to brigadier general. Colonel Bader was then serving as an active duty member of the State of New York's Air National Guard, and was nominated by the State of New York for the promotion. Appx95; Appx145; *see* 10 USC § 14316 (regarding promotion of officers in the Air National Guard). His nomination was approved by Congress. Appx95; Appx145. Colonel Bader served in the rank of brigadier general as the Assistant Adjutant General-Air within New York's Air National Guard from 2010 to 2012. Appx216. In that role, he was responsible for overseeing five units of command. Appx115.

To take this position, Colonel Bader left full-time active service and became a part-time Air Guardsman. Appx145. In military parlance, he left "Title 10 status," or full-time duty in the active military service under Title 10 of the U.S. Code. Appx95. However, as a member of the Air National Guard, Colonel Bader could be, and was, periodically

returned to active duty status as needed. *See generally* 10 U.S.C. § 12301; Appx219.

### B. Military Approval of Colonel Bader's Civilian Employment

Having accepted a part-time position in the Air National Guard, Colonel Bader was permitted also to obtain civilian employment. Before doing so, Colonel Bader repeatedly sought ethics advice from the military in order to avoid any ethical violations or conflicts of interest.

In June 2010, Colonel Bader requested an opinion from the Office of the Chief Counsel of the National Guard Bureau ("NGB") regarding any restrictions that applied to his civilian employment, including possible employment at Gauss Management Research and Engineering (GMRE), a small, veteran-owned defense contractor. Appx155, Appx167.

The Chief Counsel's Office issued an opinion which concluded that Colonel Bader "may continue to seek employment with GMRE" (the "June 2010 Ethics Opinion"). Appx157; Appx217. The June 2010 Ethics Opinion noted limits on Colonel Bader's ability to make representations to the government which would "no longer apply once … [his] Title 10 tour expire[d]." Appx155-157.

It also mentioned restrictions which would apply to Colonel Bader in his civilian capacity: those in 18 U.S.C. § 207. Appx157-59. Those restrictions include: (1) a permanent ban on representations to the military regarding certain matters in which an officer participated personally and substantially as an officer, *id.* § 207(a)(1); (2) a two-year ban on representations to the military regarding matters that were pending under an officer's official responsibility, *id.* § 207(a)(2); and (3) a one-year ban on representations to the specific agency with which the officer served, *id.* § 207(c).

The one-year ban, known as the "cooling off period," only applies following any year in which an officer served at least 60 days in active duty status. *Id.* § 207(c)(2)(B). In other words, a person serving in a part-time role who serves fewer than 60 days in a full-time status in a year is not subject to the one-year ban on making representations to the specific agency. *See id.* The opinion included two sentences addressing this one-year cooling off period but suggested it would not apply to Colonel Bader; it was "referenced" for his "information and awareness" as a "commonly-discussed restriction." Appx158.

After determining that he would like to accept employment with GMRE, in October 2010 Colonel Bader again sought a legal opinion from the Chief Counsel's Office regarding his ability to be a government contractor and also serve in his anticipated military role. Specifically, he sought an opinion on "whether [he] may be employed by an outside entity (GMRE) while servi[ng] in a Federal capacity on the NGB staff or performing MPA days[1] at the NGB." Appx161.

The Chief Counsel's Office again issued an opinion advising Colonel Bader that, subject to the restrictions noted in that opinion (the "October 2010 Ethics Opinion"), "there [wa]s no legal objection to engaging in off-duty employment." Appx161; Appx218. The October 2010 Ethics Opinion reminded Colonel Bader that he could not make certain representations "while on Title 10 status," but that those restrictions "d[id] not apply when [he] [was] not on T10 orders." Appx161.

---

[1] MPA days, or "Military Personnel Appropriation (MPA) Man-day Tour[]" days, are "[t]ours of active duty authorized to support short term needs of the active force." Air Force Rsrv. Command, *Glossary of Military & Reserve Terminology*, https://www.afrc.af.mil/About-Us/Fact-Sheets/Display/Article/156010/glossary-of-military-reserve-terminology/.

The October 2010 Ethics Opinion also included additional detail on the cooling off period under 18 U.S.C. § 207(c). This time, it indicated that the provision applied to Colonel Bader—based on his new status as brigadier general—and "prohibit[ed] [him] from making representations to [his] former agency for a period of one year following [his] last day of active duty if [he] served more than 60 days of active duty within the previous 365 days," *i.e.*, within the previous rolling year. Appx161.

The October 2010 Ethics Opinion did not mention any other restrictions on Colonel Bader's civilian employment. Appx161-162. As long as he complied with the restrictions noted in that opinion, it stated, "there [was] no legal objection" to Colonel Bader both representing GMRE and serving as a member of the NGB staff who periodically performed active duty. Appx161-162.

Colonel Bader continued to seek ethics advice as he entered his civilian role. *See* Appx169 (noting that Colonel Bader emailed the Chief Counsel's Office for advice regarding the applicability of the "cooling off" rules to international business). And he repeatedly and consistently notified the military of his civilian employment. *See* Appx169-170.

In 2012, in response to Colonel Bader's financial disclosures, which disclosed his role at GMRE, the Chief Counsel's Office sent him a "cautionary letter." ADD-2.[2] The letter found "no actual conflicts of interest" based on Colonel Bader's role at GMRE. *Id.* It noted the "possibility" that a conflict could arise if a matter involving GMRE "c[a]me before [Colonel Bader] in [his] official capacity." *Id.* "If such a matter d[id] arise," the letter instructed Colonel Bader to contact the Chief Counsel's Office for an ethics review. *Id.* Otherwise, "[n]o action [wa]s required." ADD-1.

### C. Colonel Bader's Civilian Employment

Colonel Bader notified GMRE of the cooling off statute and discussed with GMRE leadership "what steps they would take to avoid violating the statute," including limiting the scope of his work at GMRE during the cooling off period. Appx183, Appx220. To ensure compliance with the requirement, Colonel Bader began at GMRE focused on international business as the Vice President of International Programs,

[2] The "cautionary letter" is referenced in the opinion of the Court of Federal Claims, Appx9, and an advisory opinion relied on by the Correction Board. Appx485, Appx82-83. Plaintiff-Appellant is attaching the document in the Addendum to this brief for the Court's convenience.

a role that did not involve the military. Appx180, Appx182-183, Appx217-218, Appx220.

Colonel Bader carefully tracked his days in Title 10 status to ensure he complied with the cooling off period, as he understood it. He "tracked every single day [he] performed duty and in what capacity on a spreadsheet in order to strictly live within the rules." Appx46; Appx178. He had been released from Title 10 active duty orders on August 12, 2012, the same day he was promoted to brigadier general. Appx181. He was immediately put on new, temporary Title 10 active duty orders until December 31, 2010. Appx181. He understood that a cooling off period commenced when he left Title 10 status at the end of 2010, and thus the period would last until the end of 2011. Appx176. He performed fewer than 60 days on active duty in 2011 and believed his cooling off period had therefore ended on December 31, 2011. Appx146; Appx219. In 2012, he again was on active duty for fewer than 60 days and believed no cooling off period had been initiated. Appx146; Appx119-120.

After the end of 2011, Colonel Bader began representing GMRE in interactions with agencies where he was previously a full-time

employee, including the National Guard Bureau. Colonel Bader represented GMRE regarding agreements undertaken pursuant to "Other Transaction [OT] Authority." Appx167-168. Other Transaction Authority is a statutorily established vehicle through which the military can collaborate and negotiate agreements with defense contractors pursuant to certain accepted parameters and business practices. *See* 10 U.S.C. §§ 4021–4022 (formerly codified as 10 U.S.C. § 2371); *see also* Appx268–283. The agreements therefore were not subject to the Federal Acquisition Regulation or other procurement statutes. Appx167-168; Appx266, Appx289-292.

Colonel Bader took great care to keep his military and civilian roles separate throughout his time as both a general officer and a civilian employee. He went to "great lengths … to completely remove any doubt as to his status"—military or civilian—when interacting with military personnel. Appx110; *see also* Appx109 (explaining that Colonel Bader "ma[d]e abundantly clear in which capacity [military or civilian] he was acting"); Appx257. When he was acting in a civilian status "he never wore a uniform." Appx110. And while regulations governing the use of a public office authorize military personnel to use their titles

when acting in a personal capacity,[3] Colonel Bader "never introduced himself as a General Officer or used his rank or title" when acting on behalf of GMRE. Appx110. "His business cards did not state his military rank." Appx110. His "conversations did not address his military position." Appx110. He used his GMRE email address, not his military one, to conduct GMRE business. Appx194. And he "always made an appointment" if he was visiting a military location as a civilian. Appx149.

### D. The Inspector General Investigation and Letter of Reprimand

Colonel Bader applied for retirement and was approved to retire on September 1, 2012, after serving as a brigadier general for two years. Appx145. The day before his scheduled retirement, he learned that he was being investigated by the Air Force Inspector General. Appx146. The investigation was assigned to an investigating officer who had been appointed to the position in May 2012. Appx167. Colonel Bader was not

[3] 5 C.F.R. § 2635.702(a) (stating that nothing in the regulations "prohibits an employee who is ordinarily addressed using a general term of address ... or rank, such as a military or ambassadorial rank, from using that term of address or rank in connection with a personal, activity").

interviewed until January 2014, nearly a year and a half after he learned of the investigation. Appx165.

The Inspector General investigated: (1) whether Colonel Bader violated the cooling off restrictions in 18 U.S.C. § 207(c), and (2) whether he used his public office for private gain in violation of 5 C.F.R. § 2635.702. The Inspector General found both allegations substantiated.

First, the Inspector General found that Colonel Bader "did not correctly understand" section 207(c)'s cooling off period. Appx178. Colonel Bader tracked his days on active duty status by calendar year, rather than applying the "rolling year" concept. *Id.* Applying that concept, Colonel Bader was required to asses after each period of active duty service whether he had served 60 or more days on that status during the past 365 days. Appx177. When Colonel Bader finished his active duty service on December 31, 2010, he believed that, as long as he did not serve on active duty status for 60 or more days during 2011, the cooling off period would expire at the end of 2011. His last active duty day in 2011 was December 16, however. *Id.* Applying the "rolling year" concept, he was therefore required to count his active duty days going back to December 15, 2010. *Id.* And he had served in active duty

status from December 15, 2010 through December 31, 2010. When those 16 days were added to the days Colonel Bader served in 2011, Colonel Bader served 65 days in a 365-day period. *Id.* This triggered a new cooling off period, which ended in December 2012. *Id.*

Colonel Bader's misunderstanding was not corrected, and he served on active duty status for more than 60 days during another 365-day period from April 2011 to April 2012, triggering a third cooling off period, which ended in April 2013. *Id.*; Appx220. Because of his misunderstanding, in 2012, when Colonel Bader believed the cooling off period had ended and therefore communicated with agencies on behalf of his civilian employer, he ran afoul of section 207(c). Colonel Bader acknowledged that he had misunderstood and miscalculated the cooling off period. Appx98.

The Inspector General found there was also an instance in 2011 when Colonel Bader represented GMRE in an interaction with a member of a prior agency—the Air National Guard Air Force Reserve Command Test Center ("AATC")—in violation of the cooling off statute. A member of the military who had previously worked with Colonel Bader mistakenly sent a request to Colonel Bader's military email

address requesting information on a GMRE proposal (which Colonel Bader had not been involved with). Appx187; Appx194. Without thinking about the cooling off period, Colonel Bader responded from his GMRE email address to clarify numbers in the proposal. He also set up a teleconference call for the military member to learn about the use of Other Transaction Authority, from someone else. Appx184; Appx188, Appx194, Appx221-222. Colonel Bader then stopped communicating about the proposal, which was "not under his purview." Appx188. Colonel Bader acknowledged that this was a misstep and accepted responsibility for it. Appx222-223.

Second, the Inspector General found that Colonel Bader used his public office for private gain in violation of 5 C.F.R. § 2635.702.

The Inspector General "did not discover any evidence which indicated [Colonel] Bader represented GMRE while on Title 10 orders as Brig. Gen. Bader." Appx201. Nonetheless, the Inspector General found there was "'blurring' of [his] military and civilian statuses," which "support[ed] the conclusion that Colonel Bader used the authority derived from his … general officer status" and "gave rise to the appearance of a genuine conflict of interest." Appx201. The Inspector

General concluded that Colonel Bader's actions "at a minimum, created the appearance that he violated the ethical standards related to his public service as a … general officer." *Id.*

The Inspector General pointed to three categories of evidence to support that conclusion. First, because Colonel Bader "spent a considerable amount of time supporting" the National Guard "while in duty status," he had "greater access than that of a typical government contractor" (i.e., one who was not an Air Guardsman). Appx201. Second, because Colonel Bader had a part-time role as a military officer and was a private contractor, some people he worked with felt they needed to ask him whether he was acting in a military or civilian capacity before discussions with him. Appx201; *see* Appx198 ("[D]ue to Brig Gen Bader's dual role as a contractor and 'part-time' Guardsman, personnel … found themselves trying to figure out what 'hat" he was wearing."). And third, Colonel Bader, in his role as a contractor, using his private company email address and title, sent draft emails and draft contract provisions to military staff he was coordinating with on behalf of GMRE. Appx201.

In particular, Colonel Bader, as a civilian, drafted proposed email language for military members to send to advance progress on a GMRE agreement, Appx201, Appx170-171, Appx185-187, and made suggestions to the NGB regarding the Statement of Objectives ("SOO") to be included in that agreement. The Inspector General acknowledged that this agreement was pursuant to Other Transaction Authority. Appx167-168. And it acknowledged Colonel Bader's argument that GMRE was therefore permitted to work collaboratively with the government to determine the scope and objectives of the agreed project. Appx200. The Inspector General did not rebut that argument or find that Colonel Bader's actions violated any specific restriction on government contracting. But the Inspector General, without analysis, nonetheless found the use of Other Transaction Authority "not dispositive," Appx201, and criticized Colonel Bader for "help[ing] define the scope of [a] contract requirement," which was awarded to his civilian employer. Appx194. While the Inspector General did not identify any violation of law, it found Colonel Bader's actions "created the appearance that he violated … ethical standards." Appx201.

The Inspector General did not identify any evidence that Colonel Bader took any action to use his rank or title to influence military employees while working for GMRE. Instead, the Inspector General relied on the fact that Colonel Bader held roles as both a part-time military officer and a GMRE employee. For example, the Inspector General emphasized that when Colonel Bader led a meeting with the NGB in his role as a GMRE employee, a junior officer who attended the meeting—First Lieutenant Kimberly Russo—referred to Colonel Bader as "General." Appx195. She testified that she felt "a little bit of an intimidation factor" because she knew that Colonel Bader was a general officer, even though *she "understood that [he] attended the meeting as the VP for GMRE.*" *Id.* (emphasis added). *Id.* Similarly, Russo told the Inspector General she felt "a little bit of an intimidation factor" when Colonel Bader sent her proposed language for an email regarding a GMRE agreement "with him being a [general officer]," even though she again understood that he was not acting in his military role. Appx196.

Following the Inspector General report, the Air Force issued a letter of reprimand. Appx205. The letter noted in passing the Inspector General's finding that Colonel Bader technically violated the cooling off

period regulation in 18 U.S.C. § 207(c). Appx205. But it primarily relied on the finding that Colonel Bader's actions "constituted the use of a public office for private gain." *Id.* The letter stated that Colonel Bader's actions, as a civilian employee, to "solicit lucrative business contracts for [his] civilian employer blurred the lines between [his] status of active-duty officer, state-duty officer, and civilian contractor," which led to "the appearance—if not the reality—of an ethical failure." *Id.* The letter found "[p]articularly egregious" the Inspector General's finding that Colonel Bader "influenc[ed] the scope of" an agreement (by proposing language for the SOO) that was awarded to GMRE. *Id.*

### E. The Retirement Grade Determination

After the Inspector General report issued, the Air Force initiated an Officer Grade Determination. On the recommendation of an Officer Grade Determination Board, the Secretary of the Air Force determined on October 7, 2015, that Colonel Bader would be retired in the grade of colonel (0-6), rather than brigadier general (0-7). Appx333, Appx76. This decision was based on the findings in the Inspector General report. Appx333. The Officer Grade Determination Board and Secretary also had before them the letter of reprimand. Appx78.

The Secretary made the determination to retire Colonel Bader at a lower rank under 10 U.S.C. § 1370. Appx333. Under that provision "a commissioned officer … shall be retired in the highest permanent grade in which such officer is determined to have served on active duty satisfactorily." 10 U.S.C. § 1370(a)(1). "The determination of satisfactory service … shall be made …[b]y the Secretary of the military department concerned." *Id.* § 1370(a)(2)(A).

The decision to retire Colonel Bader in a lower grade prevents Colonel Bader from using the title of the highest office he obtained—brigadier general—and has caused significant reputational injury. It will also result in the loss of up to hundreds of thousands of dollars in retirement pay. Appx686(23:16-19).

### F. Termination of the Debarment Action

Based on the findings in the Inspector General report, the Air Force separately initiated a debarment action against Colonel Bader, which would have prevented him from continuing to work as a government contractor. After investigating the allegations in the Inspector General report, however, the Air Force terminated the debarment proceeding on February 9, 2015. Appx251. While the

reviewing officer found there were "were violations of post-government employment regulations," Colonel Bader had accepted responsibility for them and "failed to understand the requirements of the 'rolling year' cooling-off period." *Id.* The notice terminating the debarment proceedings did not mention any use by Colonel Bader of his public office for private gain. Appx251, Appx254.

**G. The Correction Board Decisions**

Colonel Bader challenged the Inspector General's finding of misuse of public office, the letter of reprimand, and the decision to retire him at the grade of 0-6 before the Correction Board.

The Air Force Correction Board is part of a system Congress established to allow members of the armed forces to obtain correction of their military records. *See* 10 U.S.C. §§ 1551-1559. Under this system, each Secretary of a military department may correct a military record when "necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a). The Secretary of the Air Force exercises this authority through the Correction Board, which consists of civilians "in the executive part of the Department of the Air Force" who are appointed and serve at the Secretary's pleasure. 32 C.F.R. § 865.1. Military service

members may recover "for the loss of pay, allowances, compensation, emoluments, or other pecuniary benefits ... if, as a result of correcting a record ... the amount is found to be due the claimant on account of his or another's service." 10 U.S.C. § 1552(c)-(d).

Colonel Bader argued to the Correction Board that the Inspector General's finding of misuse of public office was not supported by the evidence. Appx94, Appx99. While Colonel Bader did not contest that he had mistakenly violated the cooling off period mandated by 18 U.S.C. § 207(c), nothing in the record suggested that the decision to retire him in a lower grade, or the letter of reprimand, rested on the cooling off period violation alone. Rather, both explicitly relied on the Inspector General's conclusion that he used his public office for private gain. Appx333. That conclusion was unsupported. The letter of reprimand and the decision to retire Colonel Bader at a lower grade were therefore errors and an injustice.

In particular, Colonel Bader argued that the evidence showed only that he performed a civilian role and a military role, which was legally insufficient to support a finding of misuse of office.

First, having "access" as a military officer to a military office is not misuse of public office, Colonel Bader argued. As the Inspector General recognized, Colonel Bader only had the "access" to the NGB which the Inspector General objected to while serving "in duty status," not as a contractor. Appx201. And there was no evidence that he did anything while on duty status to promote GMRE's interests. Appx104. Being both a part-time officer, with the resulting access, and a contractor, is "not unusual nor inappropriate," Appx103, as the ethics opinions Colonel Bader received made clear, Appx348.

Second, Colonel Bader asserted that the fact that some people purportedly felt the need to clarify what role he was acting in was not evidence of impropriety. Again, it was the natural result of him lawfully occupying two statuses. The Inspector General had not pointed to any action by Colonel Bader to cause confusion. Appx103. Instead, the undisputed evidence was that Colonel Bader clearly acted as a civilian when he was one, and that those he interacted with understood that he was not operating in his military status. Appx103 (summarizing actions Colonel Bader took to make clear which role he was occupying); Appx195 (Russo "understood that Mr. Bader attended the meeting as

the VP for GMRE"); Appx196 (Colonel Bader "obviously wrote" draft email language which he sent to Russo "as the Vice President of the company"); Appx197 (officer with whom Colonel Bader interacted believed he was retired, and "recalled only seeing Mr. Bader in a suit, not in a military uniform").

Third, Colonel Bader argued that the Inspector General "did not understand the rules of OTAs" and that Colonel Bader's "lawful actions … under the OTA rules-set—actions completely within established rules and guidance"—could not be the basis of a finding of misuse of public office. Appx102-103. The draft materials Colonel Bader provided were, "under the guidelines of an OTA, … authorized and even expected." Appx104. Colonel Bader submitted evidence that Other Transaction Authority "allows government and industry to define their relationship through negotiations without the normal constraints," including by collaborating to jointly develop "program objectives" and "statement[s] of work." Appx269 n.6 (Congressional Research Service Report on Other Transaction (OT) Authority).

Colonel Bader also argued that the evidence did not support a finding that he ever intentionally used his office for private gain.

Appx76. Further, he argued that the decision to retire him at a lower grade was inconsistent with the Air Force's decision to terminate debarment proceedings. And he attached character letters from senior officers attesting to his character and record of service. Appx108-112.

The Correction Board denied Colonel Bader's request. In doing so, it did not address Colonel Bader's arguments. Its decision included no reasoning. Appx79-80. It instead relied exclusively on advisory opinions from the National Guard Bureau-General Officer Management Office ("NGB-GO") and the Secretary of the Air Force Personnel Council ("SAF/MRBP"). *Id.* Neither advisory opinion addressed Colonel Bader's challenges to the evidence described above. Appx337; Appx343-344. The NGB-GO, without analysis, simply recommended that "absent the reversal of the substantiated [Inspector General] findings," the Correction Board should deny Colonel Bader's request. Appx78. It did not acknowledge that Colonel Bader was seeking reversal of the Inspector General's findings through that very Correction Board proceeding. Appx113. The SAF/MRBP letter addressed Colonel Bader's argument regarding termination of debarment proceedings. Appx344-345. And it asserted, without citation to any law or regulation, that

Colonel Bader's character letters were "untimely." Appx344. But it did not address Colonel Bader's challenges to the sufficiency of the evidence, only asserting, without analysis, that Colonel Bader's submission "d[id] not undermine the factual or rational basis of the decisions made" and that the Secretary had "wide discretion" in this area. Appx344-345.

Colonel Bader sought reconsideration from the Correction Board. In support of his application, Colonel Bader presented a new letter from now-civilian Russo. Russo stated that while she did not see a reason to change her testimony, she believed that her "statements may have been misinterpreted by the [Inspector General]." Appx382. She had a "different perspective" and recognized that "questions the [Inspector General] asked [her] may have been leading in nature or perhaps intended to elicit a negative response towards [Colonel] Bader." *Id.* She clarified that, in her interactions with Colonel Bader, he acted as a civilian, and he "never referred to himself as Brig Gen Bader.… He came to meetings in civilian clothes, and his emails were from his company address and with his civilian title." *Id.*

Colonel Bader also challenged the Correction Board's prior decision for its failure to address his arguments. Appx372.

The Correction Board denied reconsideration. Again, it did not perform its own analysis. It "concur[ed]" with an advisory opinion from the Air Force Ethics Office ("SAF/GCA"), and concluded that "no new evidence presented rose to the level warranting this Board to overturn a thorough and valid [Inspector General] investigation," or the letter of reprimand or officer grade determination which followed. Appx83-84.

The advisory opinion from the Air Force Ethics Office recognized that Colonel Bader did not act in his military capacity to benefit himself or GMRE: a "full review of the evidence" did "not reflect any instances in which [Colonel Bader], while in his official capacity, ever explicitly directed a government employee to take actions to benefit himself or GMRE." Appx449. The advisory opinion also did not identify any instance in which Colonel Bader, in his civilian capacity, expressly used his rank or authority to obtain any benefit. In fact, the advisory opinion agreed that the evidence supported Russo's assertion that Colonel Bader "had never expressly 'used his rank' to coerce [Russo] to act on his behalf." Appx449. Nonetheless, the opinion found that "a reasonable

person could … conclude … that [Colonel Bader] engaged in behavior that blurred his statuses as [a general officer] and government contractor in a manner that allowed him to *implicitly* use the authority associated with his official position … 'to provide a benefit to himself and his employer, GMRE.'" Appx449 (emphasis added).

The "behavior" the advisory opinion identified which purportedly led to "blurring" of statuses was the fact that Colonel Bader held both his military and civilian roles. That is, the opinion found that he "blurred" his statuses by "*maintaining a continued official presence* as [a general officer] in a workplace that he also utilized as a government contractor," and "*engaging in his official capacity* as [a general officer] with individuals with whom he also did business as a government contractor. Appx447 (emphasis added). Simply by holding his official role, Colonel Bader purportedly "perpetuated his mantle of authority as a [general officer] in the minds of those with whom he did business as a government contractor." Appx447.

The advisory opinion did not address Colonel Bader's argument that occupying these two roles, without taking any action while in his public role to benefit his private employer, or any action while a civilian

invoking his official position, could not be the basis of a finding of misuse of public office. It also ignored that the military, through ethics opinions, had told Colonel Bader that he could occupy both roles, and that the ethics opinions did not identify an applicable limit on Colonel Bader's ability to operate as a contractor (when not on duty) beyond those in 18 U.S.C. § 207.

The advisory opinion did not mention the Inspector General's findings regarding Colonel Bader drafting a SOO, nor did it address Colonel Bader's related arguments that the Inspector General misunderstood Other Transaction Authority. Unlike the Inspector General Report, the advisory opinion's only criticism of Colonel Bader sending draft email language to military members was that he could have used a "more solicitous tone" rather than the "politely directive" one he used. Appx448. And it found that he "reinforced th[e] sense of his authority as a superior … officer" by using "call signs" when communicating with military personnel and by once sitting "at the head of a table … during a meeting." Appx448.

Further, while the advisory opinion recognized the new letter from Russo, it made no effort to deal with the import of her statements. It

noted that her new statement clarified that Colonel Bader "never affirmatively misrepresented his status during [their] communications or, to the best of her knowledge, contacted her on behalf of GMRE while he was in an official duty status." Appx445. Yet, with no explanation, the advisory opinion found that "a reasonable person" still could "conclude from [her] reaction that a 'normal' [non-Air Guardsman] contractor would not be afforded this type of access to [Air Force] officials." Appx445. The advisory opinion did not address Russo's belief that her "statements may have been misinterpreted by the [Inspector General]." Appx369. In fact, the advisory opinion itself continued to rely on the Inspector General's misinterpretation of Russo's statements. *See* Appx447 (asserting that Russo "viewed [Col. Bader] first and foremost as a respected [general officer]"); Appx449 (claiming Russo's "trust was misplaced").

The advisory opinion noted that, after a review, the Air Force Ethics Office had "identified no other cases with fact patterns that substantially mirror those in this case." Appx451.

### H. The Court of Federal Claims

Colonel Bader filed an action in the U.S. Court of Federal Claims and moved for a judgment on the administrative record.

Colonel Bader argued on several grounds that the Correction Board's decisions were arbitrary, capricious, and an abuse of discretion. Appx507. First, the Correction Board denied Colonel Bader's request for relief "without explaining [its] decision." Appx510. It failed to grapple with his argument that the mere fact that he performed civilian and military roles was insufficient to support a finding of misuse of public office, and that the undisputed evidence established that he kept these roles distinct. Appx515; Appx685-686(22:12-23:12). This was especially problematic because, as the Board also "ignored," military ethics opinions had instructed Colonel Bader that he could occupy civilian and military roles. Appx502, Appx515. Second, the Board did not address the Inspector General's failure to understand the "technical nature of the contracting world." Appx681(18:1-4). Finally, the Board did not respond to Russo's statement that her testimony may have been misinterpreted. Appx682-683(19:13-20:12).

Colonel Bader also argued that the Correction Board's decisions were not supported by substantial evidence, for all these reasons. Appx510. No reasonable person could conclude that Colonel Bader implicitly *used* his official position merely because he *had* that position. *See* Appx683(20:12-18). Nor was there any evidence that he acted with the intent required by the regulation. The evidence was particularly insufficient because the military had provided Colonel Bader ethics advice stating that he "was not prohibited from working for GMRE" while maintaining his official position, and Colonel Bader "took actions consistent with those opinion[s]." Appx503, Appx515. Moreover, the key witness cited by the Inspector General concerning the "appearance" of Colonel Bader's undue influence believed that her "statements may have been misinterpreted." Appx369.

The Court of Federal Claims agreed with the parties that it had jurisdiction to consider Colonel Bader's claim and award the requested relief. Appx23 (citing 10 U.S.C. § 1370). It also concluded that Colonel Bader's claim was justiciable. Appx26-27.

However, it held that Colonel Bader had not shown that the Correction Board's decisions were arbitrary, capricious, or unsupported by substantial evidence.

The court found that the Correction Board adequately addressed Colonel Bader's arguments and evidence. The court deemed it sufficient that the Correction Board "acknowledged Col[onel] Bader's argument that there was not enough evidence," Appx30-31, and that the advisory opinions the Correction Board relied on at least mentioned *some* of the evidence and arguments submitted by Colonel Bader. Appx38. For example, the court noted that one of the advisory opinions had concluded that "Col[onel] Bader's submissions … did 'not undermine the factual or rational basis of the decisions.'" Appx37. And the Air Force Ethics Office opinion "acknowledged that Colonel Bader sought ethics opinions," Appx31, "addressed the [new] letter from Ms. Russo," and concluded that the Inspector General "did not err." Appx31, Appx37-38.

The court also found the Correction Board's decisions supported by substantial evidence. Appx33. In particular, the court pointed to Colonel Bader's "access to Air Force officials" and the fact that he sent draft proposed email language to military members. *Id.* The court

rejected Colonel Bader's argument that there was no substantial evidence because there was no evidence that he acted with intent, finding that the relevant regulation did not require intent. Appx32 n.7.

The court therefore entered judgment on the administrative record for the government.

## SUMMARY OF ARGUMENT

I. The Correction Board's decisions were arbitrary and capricious. The Correction Board failed to meaningfully do business with Colonel Bader's evidence and arguments or explain its decision. In particular, it (1) ignored Colonel Bader's argument that evidence that he was a part-time officer in an agency he interacted with as a contractor did not support a finding of misuse of public office—particularly in light of the ethics advice he had received blessing that arrangement, which the Correction Board also failed to acknowledge and instead mischaracterized; (2) failed to address Colonel Bader's argument related to Other Transaction Authority; and (3) failed to sufficiently contend with Russo's concern that her testimony had been misinterpreted.

II. The Correction Board's decisions were not supported by substantial evidence. No reasonable person could conclude from the evidence that Colonel Bader misused his public office, as the primary "evidence" the Board relied on was the simple fact that Colonel Bader represented his private employer to an agency where he held a part-time role. Certainly, there was insufficient evidence that Colonel Bader acted with the intent required by the applicable regulation. This is especially true because the military had provided Colonel Bader ethics advice stating that he "was not prohibited from working for GMRE" while maintaining his official position; the evidence showed that Colonel Bader's actions were consistent with Other Transaction Authority; and the key witness cited by the Inspector General believed that her "statements may have been misinterpreted."

## ARGUMENT

This Court reviews decisions rendered by Correction Boards under the familiar Administrative Procedure Act standards to determine whether the Board's actions are "arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *Roth v. United States*, 378 F.3d 1371, 1381 (Fed. Cir. 2004); *id.* at 1394 n.14; *Walls v. United*

*States*, 582 F.3d 1358, 1367 (Fed. Cir. 2009). The Correction Board's decisions here fail to meet that standard. Its "discretion is not wide enough to justify the process it employed in this matter." *Baude*, 955 F.3d at 1293; *see also Jenkins v. Speer*, 258 F. Supp. 3d 115, 124 (D.D.C. 2017) ("[T]he [Board] is not entitled to unlimited deference").

A decision is arbitrary and capricious if the Board fails to engage in "meaningful consideration of the evidence presented." *Chisolm v. United States*, 41 F. App'x 394, 398–99 (Fed. Cir. 2002). The Board must also "explain" its decision, *id.* at 399, and that explanation cannot "run[] counter to the evidence before the [Board]," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Board "must respond to all of an applicant's non-frivolous arguments" and, at a minimum, "provide a brief statement of the grounds for denial of relief." *Schussler v. United States*, 152 Fed. Cl. 207, 213 (2021), *appeal docketed*, No. 21-1819 (Fed. Cir. Apr. 2, 2021); *see also Jenkins*, 258 F. Supp. 3d at 124. The Board's statement must be sufficiently clear that its rationale can "reasonably be discerned." *Schussler*, 152 Fed. Cl. at 213. Reliance on advisory opinions which also fail to address the evidence or adequately explain their basis is

insufficient. *See Fuentes v. United States*, 157 Fed. Cl. 433, 463 (2021). The Correction Board's decisions fail on each of these counts.

The Board's decisions also fail because they are not supported by substantial evidence. A Board decision must be supported by evidence which a "reasonable mind might accept" as "adequate to support a conclusion." *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999); *see Fisher v. United States*, 402 F.3d 1167, 1179 (Fed. Cir. 2005). No reasonable mind could conclude that Colonel Bader used his public office for personal gain based on the evidence the Board identified.

## I. STANDARD OF REVIEW.

A decision granting a motion for judgment on the administrative record is reviewed "without deference." *Baude*, 955 F.3d at 1298; *see also Roth*, 378 F.3d at 1381. The Court "appl[ies] the same standard of review" as the Court of Federal Claims, which means the Board's decision must be overturned if it is "arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *Roth*, 378 F.3d at 1381.

## II. THE CORRECTION BOARD'S DECISIONS WERE ARBITRARY AND CAPRICIOUS.

The Correction Board's decisions did not meaningfully consider, and at times misconstrued, the evidence Colonel Bader presented, and

the Board failed to acknowledge or respond to Colonel Bader's arguments.

### A. The Correction Board Ignored Colonel Bader's Argument That Representing A Civilian Employer To An Agency Where One Serves Part-Time Cannot Itself Constitute Misuse Of Public Office.

1.a. The Correction Board consistently ignored Colonel Bader's argument that, as a matter of law, representing a civil employer in communications with an agency where one serves in a part-time role is not per se misuse of public office under 5 C.F.R. § 2635.702. Nothing on the face of that regulation prohibits that conduct. And at no point during review of Colonel Bader's actions has the government—in ethics opinions, the Inspector General report, or the Correction Board opinions—identified any specific authority that supports its expansive view of section 2635.702, nor any law or regulation that specifically prohibits a person from serving as a part-time military member and making representations to his agency as a government contractor.

The lack of support for the government's reading is not surprising, as Congress has established that performing these dual roles is permissible. Congress has spoken in a detailed way to the limits on performing both a part-time military role and a role as a contractor

making representations to the military. *See* 18 U.S.C. § 207. Under 18 U.S.C. § 207(c), if a military officer has served at least 60 days in Title 10 status with an agency in the past 365 days, the officer may not make representations to that agency for one year. *Id.* § 207(c). But if the officer has not served those 60 days, section 207(c) does not apply. *See id.* § 207(c)(2)(B). If Congress had intended to maintain a complete separation between military officers and private government contractors, it would have been easy enough to draft such a categorical rule. Instead, Section 207 provides different, less stringent restrictions on representations in those circumstances. *See, e.g.*, *id.* § 207(a)(1) (creating a "permanent" restriction on making representations regarding, among other things, a particular matter in which the person "participated personally and substantially").

By specifically defining impermissible conduct, Congress left no room for the Correction Board to create a broader prohibition under the military's general authority to prevent use of public office for private gain. *See Hinck v. United States*, 550 U.S. 501, 506 (2007) (noting the "well-established principle that, in most contexts, a precisely drawn, detailed statute pre-empts more general remedies" (cleaned up)). The

Correction Board may not prohibit what Congress permitted. *See Alexander v. Sandoval*, 532 U.S. 275, 291 (2001); *Baude*, 955 F.3d at 1293.

The Correction Board did just that, relying on evidence that Colonel Bader "maintain[ed] a continued official presence as [a general officer] in a workplace that he also utilized as a government contractor," to find that Colonel Bader violated the general regulatory prohibition on use of public office for private gain. Appx447; *see also id.* (emphasizing that Colonel Bader "engag[ed] in his official capacity … with individuals with whom he also did business as a government contractor"). By maintaining that "official presence," according to the Correction Board, Colonel Bader wrongfully "perpetuated his mantle of authority as a [general officer] in the minds of those with whom he also did business as a [government] contractor." Appx447. The Correction Board's failure to address this conflict between its decision and section 207 was crucial.

Similarly, the Inspector General's misuse of public office finding rested on evidence that Colonel Bader served as a contractor in the same environment where he served as a part-time military officer. The "access" which the Inspector General found problematic was nothing

more than the normal access Colonel Bader had in his military "duty status," during which he undisputedly never represented GMRE. Appx201. That individuals purportedly felt some need to clarify which status he was in was purely the result of his lawful dual roles, and not any action Colonel Bader took to benefit from his military role. Appx201; *see* Appx198 ("*[D]ue to Brig Gen Bader's dual role as a contractor and 'part-time' Guardsman*, personnel … found themselves trying to figure out what 'hat' he was wearing." (emphasis added)). The draft materials Colonel Bader prepared were undisputedly prepared in his role as a contractor, and, according to undisputed evidence, were the type which contractors lawfully prepare in the Other Transaction Authority environment. *See supra* at 27-28.

The "boilerplate language" with which the Court of Federal Claims waived aside Colonel Bader's argument on this point—*e.g.*, "Col[onel] Bader's submissions … did 'not undermine the factual or rational basis of the decisions'" (Appx37), and the Inspector General "did not err" (Appx31, Appx37-38)—is wholly inadequate. It not possible to "discern the Board's 'path.'" *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1405 (D.C. Cir. 1995). The Board must provide an analysis of this point

that will allow this Court to determine whether it misunderstood the governing law. *Id.*; *see also Chisolm*, 41 F. App'x at 403 (a correction board's bare assertion that "[i]nsufficient relevant evidence has been presented to demonstrate the existence of probable error or injustice" was insufficient).

If the Board believed that there should be a greater separation between military officers and private government contractors, its quarrel is with Congress. Accepting that military officers can serve in both military and non-military roles within the same military operation, it is incumbent on the Board to explain exactly what Colonel Bader did that warrants such severe consequences.

1.b. The Correction Board's failure to consider Colonel Bader's argument on this point was particularly problematic because, as Colonel Bader pointed out, the military had provided multiple ethics opinions to Colonel Bader confirming that he could act as a contractor for GMRE while also maintaining his military role. None of those opinions pointed to any restriction beyond those in 18 U.S.C. § 207, which would limit Colonel Bader's ability to represent GMRE while serving in a part-time military role. Appx 161, Appx218. In short, the

military told Colonel Bader it was permissible for him to concurrently perform the dual roles which it later demoted him for performing.

The Correction Board failed to acknowledge or address this fact. In fact, the Correction Board represented one of the ethics opinions as doing the opposite. The Air Force Ethics Office advisory opinion which the Board "concur[ed] with" found it "[o]f note" that the June 2010 Ethics Opinion "specifically explained that if Applicant remained an officer in a Reserve Component and periodically returned to Title 10 status, he would have to avoid making *any* representations to the Federal government on behalf of his private employer or be subject to the criminal provisions of 10 U.S.C. § 203 and/or 10 U.S.C. § 205." Appx443 (emphasis added). That is not what the June 2010 Opinion said. Rather, it explained that "if [Colonel Bader] remain[ed] an officer in the Reserve Component and periodically return[ed] to Title 10 status, [he] must avoid making any representations to the Federal government *while on Title 10 status*." Appx156 (emphasis added). The June 2010 Ethics Opinion reiterated that the restrictions in 18 U.S.C. § 203 and/or 18 U.S.C. § 205 "no longer apply once … your Title 10 tour expires." Appx156.

The Court of Federal Claims found that the Correction Board adequately addressed the ethics opinions because the Air Force Ethics Office advisory opinion "acknowledged that Col. Bader sought ethics opinions." Appx31. But "simply stating that the evidence presented was 'considered' is not sufficient when that evidence is in direct conflict with the evidence on which the Corrections Board relied." *Chisolm*, 41 F. App'x at 398–99. Here, the Correction Board's decision ran "counter to the evidence before" it. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. As the Correction Board misunderstood the facts, Colonel Bader had been advised that "he would have to avoid making any representations to the Federal government on behalf of his private employer," while the record proves the opposite is true. Had the Correction Board understood the facts correctly, it should have reached a different conclusion. The fundamental unfairness of announcing one view of the law, then reversing course in an enforcement proceeding, is well understood. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158–59 (2012).

### B. The Correction Board Ignored the Argument that Colonel Bader's Actions Were Permitted Pursuant to Other Transaction Authority.

The Correction Board also ignored Colonel Bader's argument that proposing SOO language, and other draft materials, relating to a GMRE agreement was entirely appropriate under Other Transaction Authority, and that "lawful actions … under the OTA rules-set—actions completely within established rules and guidance"—could not be the basis of an ethics violation. *See* Appx102-103. The Correction Board's decisions "do not reflect whether it even considered this argument, much less what weight it deserved." *Dickson*, 68 F.3d at 1405.

Failure to consider this issue was significant. The letter of reprimand which was before the Officer Grade Determination Board concluded that this finding of the Inspector General's was "[p]articularly egregious." Appx205. In fact, it was the only specific finding from the Inspector General report which the letter of reprimand emphasized. *Id.* The information and argument Colonel Bader provided regarding Other Transaction Authority "places the soundness of" the Inspector General report and the letter of reprimand "directly at issue."

*Chisolm*, 41 F. App'x at 400. "Accordingly, … failure to expressly analyze the evidence was procedural error." *Id.*

### C. The Correction Board Failed to Consider Key Portions of Russo's Letter.

The Correction Board also failed to adequately grapple with Russo's letter. Russo was the key witness in the Inspector General report. The report mentioned Russo 29 times and quoted her testimony at length. *See*, *e.g.*, Appx186, Appx194-197.

The Air Force Ethics Office advisory opinion acknowledged Russo's letter, and agreed with her that Colonel Bader "never expressly 'used his rank' to coerce [her] to act on his behalf." Appx449. But it failed to address her overarching concerns that the Inspector General "intended to elicit a negative response" from her and that her prior "statements may have been misinterpreted by the [Inspector General]." Appx382, Appx455. Instead, the advisory opinion continued to rely, without question, on the Inspector General's misinterpretation of Russo's statements. *See* Appx447. "That the Corrections Board summarily discounted" Russo's letter, while continuing to rely on the Inspector General's view of her prior statements, shows "that the

Corrections Board committed a procedural error, thereby acting in an arbitrary and capricious manner." *Chisolm*, 41 F. App'x at 401.

The Board's failure to meaningfully grapple with Colonel Bader's evidence and arguments, individually, and, especially, together, renders its decision arbitrary and capricious. Colonel Bader "deserve[d] … a reviewing forum that d[id] more than rubber-stamp the actions of military officials." *Baude*, 955 F.3d at 1306. It was not enough that the Correction Board "generally adopted" the advisory opinion's conclusions, "without providing any further explanation." *Id.* at 1303. At a minimum, this Court should remand for the Board to engage in meaningful consideration of these significant issues.

## III. THE CORRECTION BOARD'S DECISIONS WERE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

It is axiomatic that absent evidence of some act by Colonel Bader to use his office for personal gain, there can be no finding of abuse of power or even an ethical violation. Indeed, under the terms of the relevant regulation, Colonel Bader must have acted with the "inten[t] to coerce or induce another person, including a subordinate, to provide" a personal benefit. 5 C.F.R. § 2635.702(a). The evidence here does not

include any action by Colonel Bader to use his public office for private gain, much less one done with the requisite intent.

1. The Board's errors, described above, resulted in a conclusion unsupported by substantial evidence. That Colonel Bader maintained his public office while also interacting with his agency as a government contractor, as permitted by law and consistent with military advice, cannot support a finding of use of public office for private gain. Nor can evidence that Colonel Bader provided draft materials to the military in a way that was consistent with the requirements of Other Transaction Authority. Reliance on the Inspector General's misinterpretations of Russo's testimony despite her letter was impermissible. Without this evidence, the Board's decisions cannot stand.

2. None of the Correction Board's findings support a conclusion that Colonel Bader "used" his public office for private gain. The term "use" means to "take, hold, or deploy (something) as a means of accomplishing a purpose or achieving a result; employ." *Oxford Dictionaries Pro* (2012); *see also Webster's New International Dictionary* 2806 (2d ed. 1939) (defining "to use" as "[t]o convert to one's service" or

"to employ"). "These various definitions of 'use' imply action and implementation." *Bailey v. United States*, 516 U.S. 137, 144–45 (1995).

There was no evidence that Colonel Bader engaged in "use" of his public office. There undisputedly was no evidence that he "represented GMRE while on Title 10 orders," Appx104, or, "while in his official capacity, ever explicitly directed a government employee to take actions to benefit himself or GMRE," Appx449. While in his civilian capacity, he undisputedly "never expressly 'used his rank' to coerce [Russo] to act on his behalf." Appx449. Nor was there any other evidence that he expressly used his rank or authority to obtain any benefit.

Colonel Bader also did not "implicitly" use his office, Appx449, by "maintaining a continued official presence as [a general officer] in a workplace that he also utilized as a government contractor," which supposedly "perpetuated his mantle of authority … in the minds of those with whom he did business as a contractor." Appx447. Simply (lawfully) holding a role is not "using" it, explicitly or implicitly. And evidence relating to the mental states of those with whom Colonel Bader did business as a civilian cannot substitute for evidence of an action by Colonel Bader to use his public office. The de minimus actions

the advisory opinion pointed to beyond merely holding dual roles—such as addressing military members using "call signs," sitting at the head of a table during a meeting, and using a tone in emails that was "politely directive"—were plainly inadequate to support a finding of misuse of public office. Appx448.

The evidence of Colonel Bader's conduct instead shows he carefully maintained a distinction between his military and civilian statuses. He went to "great lengths … to completely remove any doubt as to his status" when interacting with military personnel. Appx110; *see also* Appx109; Appx257. Among other things, when he was acting as a civilian, "he never wore a uniform" and "never introduced himself as a General Officer or used his rank or title." Appx110. Put differently, "all of this evidence points to" the conclusion that Colonel Bader acted appropriately, "while none of it supports the" Correction Board's opposite conclusion. *Miller v. Off. of Pers. Mgmt.*, 903 F.3d 1274, 1285 (Fed. Cir. 2018); *see also Kelly v. United States*, 826 F.2d 1049, 1053 (Fed. Cir. 1987) (Correction Board's conclusion was "not supported by substantial evidence" when it was contrary to evidence that was "unrebutted").

Indeed, the evidence here is nothing like the evidence this Court has found sufficient to support a finding of misuse of public office. In *Sphatt v. Department of Homeland Security*, 853 F. App'x 653, 655 (Fed. Cir. 2021), for example, an immigration officer at the Department of Homeland Security's United States Citizenship and Immigration Service submitted affidavits in a friend's immigration matter. *Id.* She "included her official job title and a photocopy of her government credentials" and "provided her government e-mail address and office phone number as preferred contact information." *Id.* She admittedly "includ[ed] her credentials … to enhance her credibility." *Id.* at 657. This Court found this evidence sufficient to support a violation of 5 C.F.R. § 2635.702. 853 F. App'x at 658. The Correction Board's unprecedented decision that Colonel Bader "used" his public office for private gain is not supported by anything approaching this evidence.

3. Further, the evidence does not support that Colonel Bader acted with "inten[t] to coerce or induce another person … to provide" a personal benefit. 5 C.F.R. § 2635.702(a). According to the Court of Federal Claims, intent was not required under 5 C.F.R. § 2635.101(b)(14), which "provides that federal employees must not

'appear' to violate the relevant ethical standards, determined from the 'perspective of a reasonable person with knowledge of the relevant facts.'" Appx32 n.7.

The court overlooked that Colonel Bader was not investigated for a violation of 5 C.F.R. § 2635.*101(b)(14)*. The Inspector General investigated and substantiated a finding that Colonel Bader violated section 2635.*702*. Appx165. Specifically, the Inspector General relied on subsection (a) of that provision, which provides that:

> An employee shall not use or permit the use of his government position or title or any authority associated with his public office in a manner that *is intended to* coerce or induce another person, including a subordinate, to provide any benefit, financial or otherwise, to himself or to … persons with whom the employee is affiliated in a nongovernmental capacity.

5 C.F.R. § 2635.702(a) (emphasis added).[4] This subsection was the basis of the Air Force Ethics opinion on which the Correction Board relied. Appx486-487.

---

[4] The Inspector General also referenced subsection (d) of this provision but failed to make any findings regarding 5 C.F.R. § 2635.502, which would be required for a finding of a violation of subsection (d). 5 C.F.R. § 2635.702(d).

Section 2635.101(b)(14) is a separate section of the regulations which states that "[e]mployees shall endeavor to avoid any actions creating the appearance that they are violating the … ethical standards set forth in this part," and "[w]hether particular circumstances create an appearance that … these standards have been violated shall be determined from the perspective of a reasonable person with knowledge of the relevant facts." 5 C.F.R. § 2635.101(b)(14).

Colonel Bader was not investigated for a violation of this provision. And it does not eliminate the express intent requirement for a violation of 5 C.F.R. § 2635.702(a). Regardless, section 1010(b)(14) itself contains an intent requirement by requiring employees to "endeavor" to avoid the appearance of violations.

The evidence here did not support a conclusion that Colonel Bader acted with intent to coerce or induce another person to provide any private benefit. Instead, the evidence showed that, aside from honest mistakes regarding the cooling off period, Colonel Bader acted consistently with ethics advice from the military stating that he "was not prohibited from working for GMRE." Appx510, Appx515.

On this record, no reasonable person could conclude that Colonel Bader used his public office for personal gain.

## CONCLUSION

For the foregoing reasons, the Court should vacate the judgment of the Court of Federal Claims and remand with instructions for that court to remand to the Correction Board to remove the letter of reprimand from Colonel Bader's file, declare that Colonel Bader shall be retired in the grade of 0-7, and award backpay. Alternatively, the Correction Board should be required to reconsider its decisions.

December 14, 2022

Respectfully submitted,

*/s/ Jillian Sheridan Stonecipher*
CARTER G. PHILLIPS
JILLIAN SHERIDAN STONECIPHER
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000

CAROLINE A. WONG
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000

*Counsel for Plaintiff-Appellant Daniel Bader*

# ADDENDUM

## Table of Contents to Addendum

Judgment, Dated July 6, 2022……………………………………Appx1

Opinion, Dated July 6, 2022………………………………………Appx2

Cautionary Letter, Dated April 19, 2012……………………….ADD-1

# In the United States Court of Federal Claims

**No. 21-1501 C**
**Filed: July 6, 2022**

**DANIEL BADER**

**JUDGMENT**

**v.**

**THE UNITED STATES**

Pursuant to the court's Opinion, filed July 6, 2022, granting in part and denying in part defendant's motion to dismiss, denying plaintiff's motion for judgment on the administrative record, and granting defendant's cross-motion for judgment on the administrative record,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that judgment is entered in favor of defendant.

Lisa L. Reyes
Clerk of Court

By: s/ Debra L. Samler

Deputy Clerk

NOTE: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Filing fee is $505.00.

# In the United States Court of Federal Claims

No. 21-1501C
(Filed: July 6, 2022)

| | |
|---|---|
| DANIEL BADER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Military Pay; 10 U.S.C. § 1370; Air Force Board for Correction of Military Records; AFBCMR; Money-Mandating; Justiciability; Judgment on the Administrative Record |

*Sean C. Timmons*, Houston, TX, for plaintiff.

*Tanya B. Koenig*, Civil Division, United States Department of Justice, Washington, DC, with whom were *Brian M. Boynton*, Acting Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Douglas K. Mickle*, Assistant Director, for defendant. *Adam E. Frey*, United States Air Force, Washington, DC of counsel.

**OPINION**

**FIRESTONE,** *Senior Judge.*

Now pending before the court in this military pay case are plaintiff Col.[1] Daniel Bader's motion for judgment on the administrative record and defendant the United States' motion to dismiss and cross motion for judgment on the administrative record. Col. Bader challenges the decisions of the Air Force Board for Correction of Military Records upholding the Secretary of the Air Force's retirement of Col. Bader at the rank of colonel, even though he had attained the higher rank of brigadier general in his final

[1] The court refers to the plaintiff as Col. Bader, using the rank at which he was retired.

two years with the Air Force reserves. The decision to retire Col. Bader at the lower rank of colonel was made following a finding of ethics violations by the Air Force Inspector General. For the reasons discussed below, the court **GRANTS** the government's cross motion for judgment on the administrative record and **DENIES** Col. Bader's motion for judgment on the administrative record. The government's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART.**

## I. STATUTORY AND REGULATORY BACKGROUND

Col. Bader's claims involve statutes and regulations governing federal ethics rules for senior government officials, officer grade determinations by the Secretary of the Air Force, and military correction boards. These statutes and regulations are discussed below.

### A. Federal Ethics Rules

The statutory and regulatory ethics provisions relevant to this case are found in 18 U.S.C. § 207 and 5 C.F.R. § 2635. Under 18 U.S.C. § 207(c)(1),

> any person who is an officer or employee . . . of the executive branch of the United States . . ., who is referred to in paragraph (2), and who, within 1 year after the termination of his or her service or employment as such officer or employee, knowingly makes, with the intent to influence, any communication to or appearance before any officer or employee of the department or agency in which such person served within 1 year before such termination, on behalf of any other person (except the United States), in connection with any matter on which such person seeks official action by any officer or employee of such department or agency, shall be punished as provided in section 216 of this title.

This one-year period, during which certain senior officials are prohibited from communicating with or appearing before their former department or agency, is referred to as a "cooling off" period. *See* AR85-86, ECF No. 8.

Section 207(c)'s one-year "cooling off" period applies to, among others, anyone "employed in a position which is held by an active duty commissioned officer of the uniformed services who is serving in a grade or rank for which the pay grade (as specified in section 201 of title 37) is pay grade O-7 or above." *Id.* § 207(c)(2)(A)(iv). For the Air Force, pay grade O-7 is the rank of brigadier general. *See* 37 U.S.C. § 201(a)(1). However, the one-year cooling off period does not apply to "special Government employee[s] who serve[] less than 60 days in the 1-year period before his or her service or employment as such employee terminates." 18 U.S.C. § 207(c)(2)(B). "Special Government employee" includes officers like Col. Bader. *Id.* § 202(a); *see also* AR102; AR409; AR412. Col. Bader was thus advised that § 207(c) prohibited him from making representations back to his former agency—the Department of the Air Force and the Department of Defense—"for a period of one year following [his] last day of active duty if [he] served more than 60 days of active duty within the previous 365 days." AR88; *see also* AR405-06; AR412.

In addition to the "cooling off" requirements, every federal employee, including military officers, must under 5 C.F.R. § 2635.101(a) "place loyalty to the Constitution, laws and ethical principles above private gain." Section 2635.101(b) lays out "general principles" that "apply to every employee," including that:

> (7) Employees shall not use public office for private gain. . . .
>
> (10) Employees shall not engage in outside employment or activities, including seeking or negotiating for employment, that conflict with official Government duties and responsibilities. . . .

> (14) Employees shall endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards set forth in this part. Whether particular circumstances create an appearance that the law or these standards have been violated shall be determined from the perspective of a reasonable person with knowledge of the relevant facts.

Section 2635.702 also prohibits an employee's use of "his public office for his own private gain" by, among other things, using "his government position or title or any authority associated with his public office in a manner that is intended to coerce or induce another person, including a subordinate, to provide any benefit . . . to himself."

**B. Officer Grade Determinations Upon Retirement**

The secretary of a military department may retire military officers "in the highest permanent grade in which such officer is determined to have served on active duty satisfactorily." 10 U.S.C. § 1370(a)(1). For officers "serving in a grade at or below the grade of major general," like Col. Bader, the "Secretary of the military department concerned" determines whether the officer served "satisfactorily" at his or her highest grade. *Id.* § 1370(a)(2). If the Secretary determines that an officer committed misconduct at a certain grade, then the Secretary "may deem the officer to have not served satisfactorily" at that grade and any higher grades, and retire the officer at a lower grade. *Id.* § 1370(a)(3); *see also* AR260 (the Secretary of the Air Force's October 7, 2015 Officer Grade Determination memorandum applying 10 U.S.C. § 1370 to Col. Bader).

As relevant to this case, the Air Force applies Officer Grade Determination actions upon retirement through Air Force Instruction 36-3203. Def.'s Resp. & Cross-Mot. at 4-5, ECF No. 13; *see also* AR257 (retiring Col. Bader "per [Air Force Instruction] 36-

3203"); AR265; Tr. at 7-8. Officer Grade Determination actions are administratively processed through the Secretary of the Air Force's Personnel Council. *See* AR265 (explaining that Col. Bader's Officer Grade Determination was processed this way); *see also* Def.'s Resp. & Cross-Mot. at 5 (citing Air Force Instruction 36-2023). "A single incident of misconduct can render service in a grade unsatisfactory despite a substantial period of otherwise exemplary service." Air Force Instruction 36-3203 ¶ 7.6.2.2 , *Service Retirements* (Sept. 18, 2015). Ultimately, the determination of satisfactory service "in a particular grade is a matter of Secretarial discretion." *Id.* ¶ 7.6.2.

**C. Military Correction Boards**

Members of the military can apply for a correction of their military records through military correction boards. *See* 10 U.S.C. § 1552. Under this system, each Secretary of a military department has the discretion to correct a military record "when the Secretary considers it necessary to correct an error or remove an injustice." *Id.* § 1552(a)(1). Record-correction determinations are made "under procedures established by the Secretary concerned." *Id.* § 1552(a)(3)(A).

The Air Force Board for Correction of Military Records ("AFBCMR" or "Board") "consists of civilians in the executive part of the Department of the Air Force who are appointed and serve at the pleasure of the Secretary of the Air Force." 32 C.F.R. § 865.1. Members of the Air Force applying for correction of their records have the "burden of providing sufficient evidence of material error or injustice" before the Board. *Id.* § 865.4(a). The AFBCMR may rely on advisory opinions and Inspector General investigative reports in making its decisions. *Id.* § 865.4(a)(1); Air Force Instruction 36-

2603 ¶¶ 4.2.2-4.2.3, *Air Force Board for Correction of Military Records* (Sept. 18, 2017). The AFBCMR may also reconsider its decisions when an applicant presents "newly discovered relevant evidence that was not reasonably available when the application was previously considered." 32 C.F.R. § 865.6(a).

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Col. Bader's Military Service

The following facts are taken from the administrative record. Col. Bader entered the Air Force from the United States Air Force Academy in 1985. AR22. He spent 12 years as an active-duty Air Force officer, until 1997. *Id.* From 1997 to 2010, Col. Bader served as a member of the Air National Guard on active duty. *Id.* In 2010, Col. Bader was selected for promotion to brigadier general within the State of New York's Air National Guard and transitioned into a "traditional reservist role" in the Air Force, where he only occupied a part-time military status.[2] *Id.*; *see also* AR405; Def.'s Resp. & Cross-Mot. at 6. During his military career, Col. Bader received multiple awards and decorations. AR143.

In 2010, Col. Bader was approached by a federal contractor, Gauss Management Research and Engineering, Inc. ("GMRE"), for potential employment. AR22. He received advice from an ethics counselor at the National Guard Bureau about

---

[2] According to a January 15, 2016 Air Force Legal Operations Agency memorandum signed by military defense counsel, by 2010, Col. Bader had "spent 25 years on active duty for both the United States Air Force and Air National Guard and earned a full active duty retirement. Because he was still a participating member of the Air National Guard, his military retirement was held in abeyance until he ultimately retire[d] from the Air Force." AR79; AR22.

transitioning to civilian employment with GMRE while still serving part time with the Air Force. AR23. The National Guard Bureau advised Col. Bader of, among other requirements, 18 U.S.C. § 207(c)'s one-year "cooling off" period. *Id.*; AR85-86.

From August 12, 2010 to December 31, 2010, Col. Bader was placed on active duty orders. AR405. He therefore incurred a "cooling off" period for the next year, starting on January 1, 2011, the day following the last day of his active duty orders. *Id.* After January 1, 2011, Col. Bader expected to transition to work with GMRE, and applied for approval to work with GMRE during his "off-duty" time. *Id.* This request was approved by the Air Force, and on October 29, 2010, Col. Bader again obtained an ethics opinion addressing, among other things, the application of § 207(c) "by virtue of his continuing part time service." *Id.* The ethics opinion again explained that Col. Bader was subject to the one-year "cooling off" period, which prohibited him "from making representations to [his] former agency for a period of one year following [his] last day of active duty if [he] served more than 60 days of active duty within the previous 365 days." AR88. Col. Bader was notified that "[i]n computing whether this restriction applies to you, you must use the concept of a 'rolling year' because you are still performing active duty periodically. On the last day of any particular period of active duty, you must look back at the previous 365 days and count the number of days on which you served on active duty. If the number totals 60 or more days, then you have a one-year 'cooling-off' period from that day." *Id.*

Col. Bader began working for GMRE in 2011 while still on part time military status. AR406. Between 2011 and 2012, Col. Bader also engaged in periods of active

duty of more than 60 days, which triggered additional "cooling off" periods. *See* AR406-07. During this time, Col. Bader worked on Air Force contracts with GMRE. *Id.* In April 2012 he received a cautionary memorandum from the National Guard Bureau after a review of his financial disclosure report, which disclosed his status as a consultant with GMRE. AR407. The memorandum advised him of potential ethical conflicts of interest between his military and civilian positions. *Id.*

Changes in Air Force management triggered Col. Bader's military retirement in 2012. AR23. Col. Bader applied for a retirement date as of September 1, 2012. *Id.* However, on August 29, 2012, Col. Bader was notified of an Inspector General investigation into the ethics of his actions while working on Air Force contracts with GMRE, and his retirement orders at the rank of brigadier general (O-7) were rescinded. AR4.

**B. The Air Force Inspector General's Investigation of Col. Bader**

The Air Force became aware of allegations that Col. Bader "violated post-government employment and ethics restrictions" through his work with GMRE in 2011 and 2012, AR92, and launched an investigation through the Air Force Office of the Inspector General, AR90-130 (excerpts of the Inspector General report). The Inspector General investigated two allegations: (1) whether Col. Bader violated the "cooling off" rules of 18 U.S.C. § 207(c), and (2) whether Col. Bader used his public office for private gain in violation of 5 C.F.R. § 2635. AR92.

Following a period of investigation, during which Col. Bader and 14 other witnesses were interviewed, AR92, an April 2014 Inspector General report found both of

these allegations "substantiated," AR129-30. On the first allegation, the report found that Col. Bader "violated the one-year 'cooling off' period by engaging in actions on behalf of GMRE, his employer, with the [Air National Guard/Air Force Reserve Command Test Center, where Col. Bader previously served] in 2011 and with the [National Guard Bureau] in 2012." AR129. More specifically, the report found that Col. Bader "directly engaged with the [Air National Guard/Air Force Reserve Command Test Center] leadership regarding a contract on behalf of GMRE which resulted in an award." *Id.* The report determined that Col. Bader communicated with the Air Force regarding Air Force contracts on "at least two occasions via email" during his 2011 "cooling-off" period, "with the intent to influence" Air Force leadership "into awarding business to GMRE." AR117. In addition, the report concluded that Col. Bader "represented GMRE on a number of occasions to the [Air National Guard/Air Force Reserve Command Test Center] and the [National Guard Bureau]" in 2012, during a later "cooling off" period. AR129.

On the second allegation, the Inspector General report found that Col. Bader's "actions while serving as an [Air National Guard] general officer and as an employee of [GMRE]" constituted a use of "his public office for private gain." *Id.* The report determined that Col. Bader "used and benefitted from the authority derived from his rank and position, and the 'blurring' of his military and civilian statuses gave rise to the appearance of conflict." *Id.* The report concluded that "[t]he appearance of impropriety was substantial" and that Col. Bader "did not avoid participating in activities which reasonably created the appearance that he was violating his public trust." AR129-30.

This, "at a minimum, created the appearance that he violated the ethical standards related to his public service as an [Air National Guard] general officer." AR128.

As a result of this investigation, the Air Force Vice Chief of Staff issued Col. Bader a Letter of Reprimand that Col. Bader received on July 24, 2014. AR132-35. Col. Bader responded to the letter on July 31, 2014. AR136. In his response, he accepted responsibility for his actions and the conclusions of the Inspector General report, stating,

> While I do not agree with all of the [Inspector General] investigation findings or conclusions, I accept responsibility for my actions and consequences. I truly believed that I was always in compliance with the "Cooling Off" period rules. I had no intention of taking actions deemed wrongful or to use a public office for private gain. Still, I understand how the [Inspector General] might conclude otherwise and accept their conclusions.

*Id.* The Air Force Vice Chief of Staff sustained the reprimand on August 29, 2014. AR135.

On November 4, 2014, the Secretary of the Air Force's Office of General Counsel initiated a federal contractor debarment action against Col. Bader based on the Inspector General report. AR137-41. Col. Bader responded to the debarment action through counsel on January 9, 2015, arguing that he inadvertently violated the post-government employment ethics restrictions because of mistaken calculations of his "cooling off" period but did not use his public office for private gain. AR142. After considering Col. Bader's response, the Air Force General Counsel's Office concluded that "the administrative record establishes violations of post-government employment regulations, which would enable [the General Counsel's Office] to continue with a debarment action." AR178. However, due to Col. Bader's acceptance of responsibility for his actions and

his failure to understand the "cooling off" requirements, the General Counsel's Office determined that his "continued ineligibility for government contracting is not necessary at this time." *Id.*

**C. Col. Bader's Officer Grade Determination**

Based on the substantiated Inspector General report, the Director of the Air National Guard initiated a discretionary Officer Grade Determination for Col. Bader on September 25, 2014, "pursuant to 10 U.S.C. § 1370 and Air Force Instruction 36-3203." AR265. Col. Bader submitted a letter to the Air National Guard Director pleading against the action. AR177. The matter was considered by a panel within the Air Force Personnel Council, which made a recommendation to the Secretary of the Air Force. AR265-66. On October 7, 2015, the Secretary of the Air Force, after reviewing Col. Bader's "entire military record of service, including the misconduct substantiated by an April 2014 Air Force Inspector General investigation," found that Col. Bader should be retired under 10 U.S.C. § 1370 in the lower grade of colonel. AR396. A memorandum for the Acting Under Secretary of Defense concurred with the Secretary of the Air Force's decision on December 2, 2015. AR261; AR397. Col. Bader was notified of the decision on February 11, 2016. AR179.

**D. Col. Bader's Initial Petition to the AFBCMR**

On June 20, 2016, Col. Bader through counsel applied to the AFBCMR for correction of his records. AR18-19. He specifically requested that (1) "the [Inspector General] Report Findings be overturned as to the substantiated allegation that he used his public office for private gain"; (2) "that his retirement grade be restored and approved in

the rank and grade of Brigadier General/O-7"; (3) "retirement pay and benefits be directed and paid"; and (4) "removal or modification of his military records to comport with the Board's findings in [t]he interest of equity and justice." AR18. Col. Bader argued that although he "has accepted responsibility for honestly but mistakenly misinterpreting the one year cooling off period," AR34, the Inspector General report incorrectly substantiated the allegation that he used his public office for private gain, AR28. Col. Bader further contended it was "clear and unmistakable error of both the Inspector General and the Officer Grade Determination Board to not consult with or consider the [Air Force General Counsel's Office] opinion terminating debarment proceedings" against him. AR26. He also submitted before the AFBCMR supporting exhibits such as his performance reports, decorations, and letters of support. AR48-69; AR183-191.

The AFBCMR sought advisory opinions from the National Guard Bureau (where Col. Bader previously served) and the Air Force Personnel Council (which processed the Officer Grade Determination). *See* AR5. The National Guard Bureau opined that Col. Bader's application to the AFBCMR should be denied because his retirement rank was based on a substantiated Inspector General investigation. AR264; AR5. Similarly, the Personnel Council advised that Col. Bader's application should be denied because there was no evidence that the Officer Grade Determination was erroneous and because the Secretary of the Air Force has wide discretion in making officer grade determinations. AR266-67; AR5.

Col. Bader responded to these advisory opinions on February 7, 2017. AR269-72. He argued that the advisory opinions incorrectly relied on the Inspector General report because "no evidence was raised to show an abuse of office" by Col. Bader. AR270. Instead, Col. Bader argued that the Inspector General report only "stands to substantiate [his] honest and reasonable mistake as to calculating the rolling year cooling off period." *Id.* Col. Bader argued that the AFBCMR, which "sits in equity," should conclude, as the Air Force General Counsel's Office did for his debarment action, that the issue was a "misunderstanding of the rolling year cooling off period," which "does not warrant an [Officer Grade Determination] grade reduction." *Id.* He also alleged that the advisory opinions failed to address certain criteria used to reach an Officer Grade Determination: (1) the nature and length of the officer's substantiated improper conduct; (2) the impact the substantiated conduct had on military effectiveness; (3) the quality and length of the officer's service in each grade at issue; (4) past cases involving similar conduct; and (5) the recommendations of the officer's command chain. *Id.* (citing Air Force Instruction 36-3203 ¶ 7.6.2.2 (Sept. 18, 2015)); *see also* AR265 (advisory opinion of the Air Force Personnel Council listing these five factors). Col. Bader contended that these factors weighed in his favor. AR271.

A panel of the AFBCMR met on September 26, 2017, and concluded that no error or injustice existed in Col. Bader's case that would warrant the requested relief. AR7. After reviewing the record, Col. Bader's arguments, and the advisory opinions, the Board "agree[d] with the opinion and recommendation of [the advisory opinions], and adopt[ed]

their rationale as the basis for [the Board's] conclusion [that] the applicant has not been the victim of an error or injustice." AR6.

### E. Col. Bader's Application for AFBCMR Reconsideration

On September 5, 2019, Col. Bader through counsel filed an application for reconsideration of the AFBCMR's September 26, 2017 denial. AR274-97. The application included an advisory opinion by Don Fox, a former government ethics attorney, and other exhibits and character letters. AR299-363. The application also included a statement from former-Lieutenant Kimberly Russo, who had been interviewed during the Inspector General investigation and who explained that her previous statements to the Inspector General regarding Col. Bader's conduct while working with GMRE "may have been misinterpreted." AR304.

Col. Bader's reconsideration application argued that the Board committed errors when it did not seek an advisory opinion from the Air Force General Counsel's Office, relied on the advisory opinions which did not analyze the Inspector General report, and failed to consider all of the evidence submitted by Col. Bader. AR294-95. Col. Bader reiterated that while he misunderstood the one-year cooling off-period, he—contrary to the substantiated finding of the Inspector General report—never abused his public position for private gain. AR296.

In response to the reconsideration application, the AFBCMR sought an advisory opinion from the Secretary of the Air Force's Office of General Counsel. AR404-14. After reviewing Col. Bader's arguments before the AFBCMR and the Inspector General report, the advisory opinion concluded that Col. Bader had committed an ethics violation

and that his reduction in grade was permissible and within the discretionary range of consequences. *Id.* Col. Bader disagreed with this advisory opinion and argued that the opinion misinterpreted or ignored the evidence presented in his reconsideration application. AR376-79.

Between July 28 and September 28, 2020, a panel of the AFBCMR convened to consider Col. Bader's reconsideration application. AR11. After reviewing Col. Bader's arguments and exhibits, the new advisory opinion, and Col. Bader's response to the advisory opinion, the panel concurred with the Office of General Counsel and found that "no new evidence presented rose to the level warranting this Board to overturn a thorough and valid [Inspector General] investigation, nor the decisions from senior Department of Defense and Air Force officials regarding the applicant's letter of reprimand and subsequent officer grade determination." *Id.* The AFBCMR concluded that "the evidence did not demonstrate material error or injustice." *Id.*

### F. The Instant Case

On June 23, 2021, Col. Bader through counsel filed a complaint in this court, and then filed an amended complaint on August 9, 2021. Compl., ECF No. 1; Am. Compl., ECF No. 5. The amended complaint challenges the AFBCMR's decisions upholding the retirement of Col. Bader at the rank of colonel rather than brigadier general. Am. Compl. ¶ 1. The amended complaint lists the following statutes as the bases for Col. Bader's claim: the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*; the Tucker Act, 28 U.S.C. § 1491; the Due Process Clause of the Fifth Amendment; 10 U.S.C. § 1552 (governing military correction boards); 10 U.S.C. § 1558 (governing military

"special boards" and "selection boards"); and 37 U.S.C. §§ 201-12 (governing military members' entitlement to basic pay). Am. Compl. ¶¶ 2-3. The amended complaint further describes Col. Bader's cause of action as arising under the APA. Am. Compl. ¶¶ 56-62.

Col. Bader alleges that the Board's denial of his application for correction of his military records was arbitrary and capricious, was contrary to the Due Process Clause of the Fifth Amendment, and was in excess of statutory jurisdiction, authority, or limitations. Am. Compl. ¶ 60. Col. Bader further alleges that the Board failed to provide him with an adequate explanation, which "renders the decision arbitrary and capricious." *Id.* ¶ 61. He seeks "declaratory relief in the form of a military retirement in the grade of O-7," "removal of the general officer memorandum of reprimand" from his records, and "at least $20,647" in wrongfully denied retirement pay. *Id.*, Prayer for Relief ¶¶ A-C.

The government filed the administrative record on August 23, 2021, and on September 22, 2021, Col. Bader filed a motion for judgment on the administrative record, ECF No. 9. He contends that the AFBCMR "rubber stamped" the advisory opinions when it denied his applications, rendering those decisions arbitrary and capricious. *Id.* at 13; *see also id.* at 16. As he did before the Board, Col. Bader challenges the underlying findings in the Inspector General report and the Board's reliance on the report. *Id.* at 13-14. He contends that the AFBCMR "wholly ignored" certain arguments and evidence he submitted. *Id.* at 14. Finally, Col. Bader argues that he has a "liberty interest in his retirement [grade]," *id.* at 9, and contends that the AFBCMR violated his due process rights by presuming him guilty of ethics violations and "depriv[ing] him of a meaningful opportunity to see[k] redress," *id.* at 15.

Case: 22-2203 Document: 9 Page: 86 Filed: 12/14/2022

The government filed its response to Col. Bader's motion, combined with a motion to dismiss and a cross motion for judgment on the administrative record, on November 5, 2021. The government contends that Col. Bader's amended complaint should be dismissed under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") for lack of subject matter jurisdiction because Col. Bader does not plead any money-mandating statute applicable to his claims. Def.'s Resp. & Cross-Mot. at 16-19. The government does, however, explain in a footnote that Col. Bader may have brought his claims under the money-mandating military retirement pay statutes. *Id.* at 18 n.6. The government next argues that Col. Bader's challenge to his Officer Grade Determination is non-justiciable and must be dismissed under RCFC 12(b)(6) because it is a decision committed to the discretion of the Secretary of the Air Force. Def.'s Resp. & Cross-Mot. at 19-21. Finally, the government argues that even if the court were to construe the amended complaint as alleging a justiciable claim over which it has jurisdiction, judgment on the administrative record should be granted in favor of the government because the AFBCMR's decisions were rational and supported by substantial evidence, and Col. Bader was not deprived of his due process rights. *Id.* at 21-27.

On December 1, 2021, Col. Bader filed his response and reply. He argues that 10 U.S.C. § 8929, which entitles members of the Air Force to retirement pay, is a money-mandating statute sufficient to confer jurisdiction. Pl.'s Resp. & Reply at 4, ECF No. 14. Col. Bader asserts that his claims are justiciable because the court can "direct appropriate relief in the form of a remand to the AFBCMR." *Id.* Finally, he argues that the decision of the Board is not entitled to the "Chevron-type deference" of the "arbitrary and

capricious" standard of review that this court applies to military correction board decisions. *Id.* at 4-5. Col. Bader contends that the AFBCMR "committed an injustice by not correcting his record" because he only committed a "technical violation of the applicable ethical rules" and his retirement at a lower grade "did not fit his 'crime.'" *Id.* at 5.

On December 22, 2021, the government filed its reply, arguing that Col. Bader's "allegations of injustice . . . provide no basis for judicial relief." Def.'s Reply at 3, ECF No. 15. The government reiterates that Col. Bader's claims are not justiciable, and that the Board's decision was supported by substantial evidence in the administrative record. *Id.* at 4-7.

On February 16, 2022, this case was transferred to the undersigned judge. Order, ECF No. 16. Oral argument was held on June 16, 2022.

## III. DISCUSSION

The court first addresses the arguments made in support of the government's motion to dismiss and then turns to the parties' cross motions for judgment on the administrative record.

### A. Col. Bader Fails to Identify a Money-Mandating Statute Applicable to His Claims in His Amended Complaint

The government first argues that Col. Bader fails to identify a money-mandating statute in his amended complaint that is applicable to his claims for retirement pay. Def.'s Resp. & Cross-Mot. at 16-19. The court agrees.

"The Tucker Act authorizes certain actions for monetary relief against the United States to be brought in the Court of Federal Claims." *Martinez v. United States*, 333 F.3d 1295, 1302 (Fed. Cir. 2003) (en banc). Although the Tucker Act serves as a waiver of sovereign immunity and a jurisdictional grant, it does not create a substantive cause of action. *Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.*, 525 F.3d 1299, 1306 (Fed. Cir. 2008). Rather, a plaintiff must establish that "a separate source of substantive law . . . creates the right to money damages." *Id.* (quotation omitted). "[A] statute or regulation is money-mandating for jurisdictional purposes if it 'can fairly be interpreted as mandating compensation for damages sustained as a result of the breach of the duties [it] impose[s].'" *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (quoting *United States v. Mitchell*, 463 U.S. 206, 217 (1983)).

As noted above, Col. Bader's amended complaint cites as the bases for his claim the APA, the Fifth Amendment Due Process Clause, 10 U.S.C. § 1552 (governing correction of military records), 10 U.S.C. § 1558 (governing military "special boards" and "selection boards"), and 37 U.S.C. §§ 201-212 (governing service members' entitlement to basic pay). Am. Compl. ¶¶ 2-3. However, these sources of law either do not provide this court with jurisdiction, or are not applicable to Col. Bader's claim for retirement pay.

**1. Some of the sources of law identified by Col. Bader in his amended complaint are not money-mandating and therefore do not provide this court with jurisdiction.**

Some of the statutes and constitutional provisions Col. Bader cites in his amended complaint are not money-mandating and cannot provide this court with jurisdiction. It is

well-settled that the APA is not money-mandating. *See, e.g.*, *Wopsock v. Natchees*, 454 F.3d 1327, 1333 (Fed. Cir. 2006) ("[T]he APA does not authorize an award of money damages at all . . . ."). The Fifth Amendment Due Process Clause is also not a money-mandating source of law. *See, e.g.*, *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995) (holding that "the Due Process Clause[] of the Fifth . . . Amendment" is not "a sufficient basis for jurisdiction" under the Tucker Act because the Due Process Clause does "not mandate payment of money by the government"). The Federal Circuit has concluded that 10 U.S.C. § 1552 is not a money-mandating statute providing a separate and distinct cause of action under the Tucker Act. *Martinez*, 333 F.3d at 1315. Likewise, 10 U.S.C. § 1558, which governs review of certain actions regarding military "special boards," only provides for equitable relief and cannot serve as the money-mandating basis for this court's jurisdiction.[3] *See Baude v. United States*, 137 Fed. Cl. 441, 448-49 (2018) (holding that § 1558 is not money-mandating but may provide equitable relief ancillary to a money damages claim based on a separate money-mandating statute), *vacated and rev'd on other grounds*, 955 F.3d 1290 (Fed. Cir. 2020). Therefore, to the extent Col. Bader relies on these statutes, the government's motion to dismiss for lack of subject matter jurisdiction is granted.

[3] The Federal Circuit has not specifically addressed whether 10 U.S.C. § 1558 is money-mandating. However, Col. Bader in his briefs does not rely on § 1558 as a money-mandating source of law or explain how this provision is applicable to this case, and for this additional reason the court holds that § 1558 cannot serve as the statutory basis for his claim.

**2. Some of the statutes identified by Col. Bader in his amended complaint are money-mandating but are not applicable to his claim.**

Col. Bader also cites in his amended complaint 37 U.S.C. §§ 201-12, Am. Compl. ¶ 3, but does not, in his briefing before this court, mention these provisions or explain how they are applicable to his claim. While some of these provisions are money-mandating, Col. Bader cannot under RCFC 12(b)(6) state a claim for relief under them because they are not applicable to his claim for retirement pay.

Sections 202 to 212 of title 37 govern military members' entitlement to basic pay. In particular, § 204 provides that members of the military on active duty or certain other full-time duty "are entitled to the basic pay of the pay grade to which assigned." The Federal Circuit has held that § 204 is a money-mandating statute that confers jurisdiction on this court. *Martinez*, 333 F.3d at 1315. However, Col. Bader makes no claim for basic pay in his complaint. Instead, his claim is limited to an adjustment of his retirement pay. Therefore, while § 204 is money-mandating, it does not provide for the relief requested by Col. Bader. Col. Bader thus fails to state a claim upon which relief can be granted under 37 U.S.C. § 204. *See Ancman v. United States*, 77 Fed. Cl. 368, 375 (2007). In addition, as the government notes, 37 U.S.C. § 202 concerns retirement pay, but only applies to certain United States Coast Guard ranks. Def.'s Resp. & Cross-Mot. at 17-18. Even if the court were to hold § 202 money-mandating, Col. Bader as a retired member of the Air Force could not state a claim upon which relief could be granted under this provision. Therefore, to the extent that Col. Bader relies on § 202 and § 204, the

government's motion to dismiss is granted for failure to state a claim under RCFC 12(b)(6).

In sum, none of the sources of law cited in Col. Bader's amended complaint provide a basis on which his claim for retirement pay could proceed in this court.

### B. Section 1370 of Title 10 Provides This Court with Jurisdiction Over Col. Bader's Claim, and His Requested Relief Falls Within the Scope of This Statute

Nevertheless, all parties agree that 10 U.S.C. § 1370 is a money-mandating statute applicable to Col. Bader's claim that supplies this court with jurisdiction under the Tucker Act.[4] Tr. at 9, 18-19. As explained above, § 1370(a)(1) requires that an officer "be retired in the highest permanent grade in which such officer is determined to have served on active duty satisfactorily." In cases where, as here, a military member alleges that he or she was retired at the wrong grade, this court has held that 10 U.S.C. § 1370 is a money-mandating statute that provides this court with jurisdiction over such claims. *See, e.g.*, *Waters v. United* States, 139 Fed. Cl. 9, 18 (2018) (finding § 1370 as a basis for jurisdiction, and citing cases); *Emoto v. United States*, No. 17-228C, 2017 WL 5167383,

[4] The government at oral argument asserted that Col. Bader did not in his briefs or the amended complaint contend that § 1370 provides this court with jurisdiction, suggesting that this argument is now waived. *See* Tr. at 8. However, Col. Bader does mention § 1370 in his motion for judgment on the administrative record. Pl.'s Mot. at 13. In addition, the allegations in Col. Bader's complaint could be read as asserting a claim under § 1370. *See* Am. Compl. ¶¶ 1, 60. As the court agrees with the parties that § 1370 provides the court with jurisdiction, the court will not dismiss Col. Bader's claim because he failed to specifically cite this statute in his amended complaint. *See Nicely v. United States*, 23 F.4th 1364, 1367 (Fed. Cir. 2022) ("[W]e must look to the substance of the allegations in a complaint when assessing" jurisdiction, "not the label a claimant places on them."); *Ancman*, 77 Fed. Cl. at 375 (addressing money-mandating bases for claims not cited in the complaint); *Waters v. United States*, 139 Fed. Cl. 9, 18 (2018) (finding jurisdiction under § 1370 even though the plaintiff made a claim under § 204).

at *10 (Fed. Cl. Nov. 8, 2017) (finding § 1370 money-mandating). Thus, as the government recognizes, Col. Bader's claim can proceed under this money-mandating "retirement pay statute[]." Def.'s Resp. & Cross-Mot. at 18 n.6 (citing *Lewis v. United States*, 458 F.3d 1372, 1376 n.2 (Fed. Cir. 2006)). Accordingly, the court has Tucker Act jurisdiction[5] over Col. Bader's claim. In addition, Col. Bader's claim falls within the scope of this statute.

### C. Col. Bader's Challenge to the AFBCMR Decisions Is Justiciable

The government next argues that even if the court possesses jurisdiction, the decision to reduce Col. Bader's rank was committed to the Air Force's discretion and, therefore, Col. Bader's challenge to that decision is not justiciable. Def.'s Resp. & Cross-Mot. at 19-21. The question of justiciability is distinct from the question of jurisdiction. *Voge v. United* States, 844 F.2d 776, 779-80 (Fed. Cir. 1988) (holding that the military's exercise of discretion is nonjusticiable, even if the court has Tucker Act jurisdiction). "A controversy is justiciable only if it is one which the courts can finally and effectively decide, under tests and standards which they can soundly administer within their special field of competence." *Id.* at 780 (internal quotations omitted). In other words, the court must ensure that it is competent to hear Col. Bader's challenge.

---

[5] Although not challenged by the government, the court also finds that Col. Bader's claim is timely because his complaint was filed within six years of the Secretary of the Air Force's October 7, 2015 decision retiring him under 10 U.S.C. § 1370 at the rank of colonel. *See* 28 U.S.C. § 2501; AR396; Tr. at 6-7, 18.

"Justiciability is a particularly apt inquiry when one seeks review of military activities," *Murphy v. United States*, 993 F.2d 871, 872 (Fed. Cir. 1993); *see also Roth v. United States*, 378 F.3d 1371, 1385 (Fed. Cir. 2004), because "judges are not given the task of running the" military, *Orloff v. Willoughby*, 345 U.S. 83, 93-94 (1953). Typically, "the merits of a service secretary's decision regarding military affairs are unquestionably beyond the competence of the judiciary to review." *Adkins v. United States*, 68 F.3d 1317, 1322 (Fed. Cir. 1995). The Federal Circuit has thus recognized that there are "thousands of . . . routine personnel decisions regularly made by the services which are variously held nonjusticiable or beyond the competence . . . of courts to wrestle with," *Voge*, 844 F.2d at 780, including promotion decisions, *id.* at 782; *Adkins*, 68 F.3d at 1324.

However, while the "merits of a decision committed wholly to the discretion of the military are not subject to judicial review, a challenge to the particular *procedure* followed in rendering a military decision may present a justiciable controversy." *Adkins*, 68 F.3d at 1323 (emphasis in original). Even in areas within its discretion, the military is "bound to follow its own procedural regulations if it chooses to implement some," *Murphy*, 993 F.2d at 873, because "those procedures by their nature limit the military's discretion," *Fisher v. United States*, 402 F.3d 1167, 1177 (Fed. Cir. 2005).

Applying these standards to this case, under 10 U.S.C. § 1370, the determination of satisfactory service of an officer for purposes of an officer grade determination falls within the discretion of, as relevant here, the Secretary of the Air Force. *See also* Air Force Regulation 36-3203 ¶ 7.6.2, *Service Retirements* (Sept. 18, 2015) (stating that the

officer grade determination is "wholly" within the Secretary's discretion); *see also Kim v. United States*, No. 03-1562C, 2006 WL 5629222, at *6 (Fed. Cl. June 16, 2006) ("It is clear that the Secretary has the authority to make such retirement determinations based upon whether a member's service was satisfactory at a given grade."). Therefore, to the extent Col. Bader asks this court to re-evaluate the merits of his Officer Grade Determination, that claim is not justiciable, and the government's motion to dismiss under RCFC 12(b)(6) is granted.[6]

However, Col. Bader's amended complaint seeks review of the AFBCMR's decisions upholding his Officer Grade Determination, Am. Compl. ¶ 1, alleging that the Board failed to adequately explain its decisions or provide the necessary due process, *id.* ¶¶ 60-61. The court frequently reviews such challenges to military correction board decisions under an "arbitrary and capricious" standard of review. *See* Tr. at 12-13; *see also Adkins*, 68 F.3d at 1325 (holding that the "procedural aspects of a military record correction decision [are subject] to judicial scrutiny"); *Lewis*, 458 F.3d at 1376 (noting correction board decisions are subject to judicial review); *Woodward v. United States*, 871 F.2d 1068, 1073 (Fed. Cir. 1989) (noting that "the Claims Court was correct in holding that it had jurisdiction in a claim for money damages to consider [an] allegation of violations of constitutional rights"); *Miller v. United States*, 119 Fed. Cl. 717, 731 (2015) ("[O]nce a service-member has had recourse to a corrections board, the focus is

[6] Col. Bader also does not identify in his briefs before this court a specific procedural violation committed by the Secretary in making the challenged Officer Grade Determination.

both on the procedural infirmity alleged before the board, as well as on a review of the board's decision under the arbitrary and capricious standard."); *Quinton v. United States*, 64 Fed. Cl. 118, 124 (2005) (holding that the issue of whether the decision of a military correction board was arbitrary or capricious was the type of decision "the court frequently reviews"). Therefore, as to Col. Bader's challenges to the decisions of the AFBCMR as inadequately supported or as violating his due process rights, the government's motion to dismiss Col. Bader's claim on justiciability grounds is denied. The court proceeds to evaluate the parties' cross motions for judgment on the administrative record as to these challenges.

### D. Col. Bader Has Not Demonstrated that the AFBCMR's Decisions Were Arbitrary, Capricious, Unsupported by Substantial Evidence, or Contrary to Law

The Court of Federal Claims reviews decisions of military correction boards based on the administrative record. *See, e.g.*, *Walls v. United States*, 582 F.3d 1358, 1367 (Fed. Cir. 2009). Parties may move for judgment on the administrative record pursuant to RCFC 52.1. In deciding a motion pursuant to RCFC 52.1, the court makes "factual findings from the record evidence as if it were conducting a trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1357 (Fed. Cir. 2005). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. *See id.* at 1356.

The court reviews the administrative record to determine whether a board's decision is arbitrary, capricious, unsupported by substantial evidence, or contrary to law. *See Chappell v. Wallace*, 462 U.S. 296, 303 (1983) (noting that a decision of the Board

for Correction of Naval Records is "subject to judicial review" and may be set aside if it is "arbitrary, capricious or not based on substantial evidence"); *Barnick v. United States*, 591 F.3d 1372, 1377 (Fed. Cir. 2010). The scope of this judicial review is a deferential one. *See Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983). The arbitrary and capricious standard of review "does not require a reweighing of the evidence, but a determination whether the conclusion being reviewed is supported by substantial evidence." *Id.* at 1157 (emphasis removed). In determining whether a conclusion is supported by substantial evidence, "all of the competent evidence must be considered . . . whether or not it supports the challenged conclusion." *Id.* (emphasis removed). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Strand v. United States*, 951 F.3d 1347, 1351 (Fed. Cir. 2020) (internal quotation omitted). The court may not "substitute [its] judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." *Heisig*, 719 F.2d at 1156 (footnote omitted).

The plaintiff bears the burden of showing by "cogent and clearly convincing evidence" in the record that a board's decision is arbitrary, capricious, contrary to law, or unsupported by substantial evidence. *Wronke v. Marsh*, 787 F.2d 1569, 1576 (Fed. Cir. 1986). "[M]ilitary administrators are presumed to act lawfully and in good faith like other public officers, and the military is entitled to substantial deference in the governance of its affairs." *Dodson v. U.S. Gov't, Dep't of Army*, 988 F.2d 1199, 1204 (Fed. Cir. 1993); *see also Richey v. United States*, 322 F.3d 1317, 1326 (Fed. Cir. 2003) (noting "the presumption of regularity that attaches to all administrative decisions").

Col. Bader's challenge to the Board's decisions in this case centers on his assertion that, contrary to the Inspector General's findings, he did not use his public office for private gain, and that, therefore, the decision to retire him at a lower grade was disproportionate to his actual misconduct. At oral argument, Col. Bader's counsel focused on his contentions that the AFBCMR inadequately supported its decisions given contrary evidence in the record. *See* Tr. at 19-21. The court addresses this argument first, and then turns to the remaining arguments raised in the briefs.

**1. The AFBCMR did not ignore countervailing evidence.**

In briefing and at oral argument, Col. Bader contends that the AFBCMR improperly failed to consider the evidence he submitted to show that he never used his public office for private gain in violation of 5 C.F.R. § 2635 and that the decision to reduce his rank was unjust. Tr. at 17-19, 21-22; Pl.'s Mot. at 12-14. Specifically, Col. Bader argues that in upholding the Secretary's Officer Grade Determination, the Board (1) "ignored the fact that [he] never explicitly or implicitly attempted to coerce another to act in a certain manner by means of his rank or position," (2) "ignored the fact that all of [his] communications to military officials [during his time with GMRE] were made using his work email and that he attended meetings in civilian attire," and (3) "ignored the fact that [he] sought multiple ethics opinions to ensure he was not violating any law or rule." Pl.'s Mot. at 14; *see also* Tr. at 20 (arguing that the Board "cherry-picked the information that they wanted to rely on"), 21 (noting that Col. Bader sought ethics opinions).

At oral argument, counsel for Col. Bader also focused on a letter by former-Lt. Kimberly Russo that Col. Bader submitted with his AFBCMR reconsideration

application. Tr. at 19-20. Lt. Russo (now a civilian), AR411, was a witness in the Inspector General investigation. The Inspector General report relied in part, on Lt. Russo's statements to conclude that Col. Bader's actions violated the "cooling off" rules and 5 C.F.R. § 2635. AR112-13, 116, 121-24, 128. Specifically, Lt. Russo stated that Col. Bader directed her to send emails he had drafted on behalf of GMRE using her own signature line. *Id.*; *see also* AR410-11. Lt. Russo also stated that Col. Bader's rank influenced her actions with regard to her work with GMRE contracts. AR123-24. In her letter submitted with Col. Bader's reconsideration application, Lt. Russo stated that, while she stood by her statements, the Inspector General may have "misinterpreted" her testimony regarding Col. Bader's conduct. AR304.

Counsel for Col. Bader at oral argument also referenced a memorandum by Don Fox that Col. Bader submitted with his reconsideration application before the Board. Tr. at 20. Mr. Fox is a former Acting Director and General Counsel at the United States Office of Government Ethics and a former Air Force Deputy General Counsel. AR299. Mr. Fox opined that "the decision to reduce Colonel Bader in grade was grossly disproportionate to any recommendation I would have made in a similar case." AR300.

After carefully reviewing the record and the parties' arguments, the court disagrees with Col. Bader's contention that the Board improperly ignored countervailing evidence submitted by Col. Bader. The Board described the evidence and arguments made by Col. Bader before the Board in both its initial and reconsideration decisions. AR3-11. In particular, the AFBCMR acknowledged Col. Bader's argument that there

was not enough evidence in the record "to show abuse of office by [Col. Bader]" under 5 C.F.R. § 2635. AR6 (initial decision); *see also* AR8 (reconsideration decision).

Likewise, the advisory opinions relied on by the AFBCMR addressed Col. Bader's arguments and evidence. AR264-67; AR404-14. The General Counsel's Office advisory opinion in particular acknowledged that Col. Bader sought ethics opinions, AR405, and analyzed in detail Col. Bader's central contention that the Inspector General findings were inaccurate, reviewing his interactions with military officials during his time at GMRE to determine whether he used his public office for private gain, AR404-11.

The General Counsel's Office advisory opinion also specifically addressed the letter from Ms. Russo. AR407, 411. The General Counsel's Office opined that "[w]hile 1Lt Russo subsequently clarified . . . that [Col. Bader] never affirmatively misrepresented his status . . . or, to the best of her knowledge, contacted her on behalf of GMRE while he was in an official duty status, a reasonable person could conclude from the lieutenant's reaction that a 'normal' contractor would not be afforded this type of access to [Air Force] officials during this stage of the contracting process." *Id.* The General Counsel's Office acknowledged that Col. Bader never expressly used his rank to coerce others to act on his behalf or directed a government employee to take actions to benefit himself or GMRE. AR411. Nevertheless, the advisory opinion concludes that "a reasonable person could review the evidence presented in the case and conclude, as did [the Inspector General], that [Col. Bader] engaged in behavior that blurred his [military and contractor] statuses . . . in a manner that allowed him to implicitly use the authority associated with

his official position" to benefit himself and GMRE.[7] *Id.* This rationale was adopted by the AFBCMR. AR10-11.

Finally, the record reflects that the Board and the General Counsel's Office considered Mr. Fox's letter when reviewing Col. Bader's reconsideration application. AR9. While neither the Board nor the General Counsel's Office advisory opinion specifically discussed this letter, both concluded after reviewing Col. Bader's submissions that his application for reconsideration should be denied. AR9-10. More specifically, the General Counsel's Office concluded that "[n]othing in the record, to include the new matters [Col. Bader] has submitted, indicates the Officer Grade Determination action was inappropriate or the [Secretary's] decision was erroneous, arbitrary or unjust." AR413. Based on this record, the court cannot conclude that the AFBCMR ignored Mr. Fox's letter such that the Board's decisions were arbitrary or capricious. *See Boyer v. United States*, 323 F. App'x 917, 920 (Fed. Cir. 2009)

---

[7] At oral argument, counsel for Col. Bader also argued that Col. Bader's conduct was "not intentional or done with any desire to gain an unfair advantage or an upper hand." Tr. at 17; *see also id.* at 23, 27. However, as the government argues, Tr. at 16, Col. Bader's "intent" is not determinative of whether he violated § 2635, which provides that federal employees must not "appear" to violate the relevant ethical standards, determined from the "perspective of a reasonable person with knowledge of the relevant facts." 5 C.F.R. § 2635.101(b)(14). In addition, the record reflects that the Board considered Col. Bader's arguments regarding his lack of intent, as well as evidence in the record from the Inspector General report and the advisory opinions. *See, e.g.*, AR118-19; AR128-29 (Inspector General report describing and applying § 2635); AR408 (Office of General Counsel's advisory opinion). As discussed *infra*, based on this record, the court concludes that the Board's decisions denying Col. Bader's applications were supported by substantial evidence.

(explaining that even where a Board does not cite certain evidence, "the evidence was in the record, [and] was presumptively considered").

In sum, after a review of the record, the court concludes that Col. Bader has failed to show that the Board improperly ignored countervailing evidence in upholding his Officer Grade Determination. To the contrary, the AFBCMR and the advisory opinions relied on by the Board provided sufficient answers to the objections raised by Col. Bader.

**2. The AFBCMR's decisions upholding the Officer Grade Determination are supported and reasonable.**

In addition, to the extent Col. Bader is arguing that the Board's decisions upholding his Officer Grade Determination are arbitrary, capricious, or not based on substantial evidence, the court disagrees. As the government argues, *see* Def.'s Resp. & Cross-Mot. at 22-25, there is evidence in the record that undermines Col. Bader's assertions that the Inspector General report's findings are erroneous. For example, as explained by the General Counsel's Office advisory opinion discussing, in detail, the Inspector General report, AR409-411, Col. Bader "sent numerous emails to [Air Force] representatives [junior to Col. Bader] . . . in which he politely directed them to adopt his prepared 'cutline' text as their own and email other [Air Force] officials requesting information or actions in support of GMRE government contracts." The advisory opinion also explains that Col. Bader's communications and access to Air Force officials resulted in an approximately $1.4 million contract for GMRE. AR410. This and other evidence of Col. Bader's conduct in the record supports the conclusion that Col. Bader "blurred lines of authority in advancing GMRE's interests." AR409-10.

Moreover, Col. Bader conceded in response to the Inspector General report that he violated § 207(c)'s "cooling off" requirements. AR136. Given this concession, the substantiated Inspector General report regarding Col. Bader's misconduct, the advisory opinions obtained by the AFBCMR, and the discretion granted to the Secretary in making officer grade determinations, the court concludes that the AFBCMR's decisions upholding Col. Bader's Officer Grade Determination are reasonable and supported by substantial evidence.

At oral argument, Col. Bader's counsel suggested that the court reweigh the evidence in the record, Tr. at 21, to evaluate whether "the punishment that was meted out" – his retirement grade reduction – "outweighs what Colonel Bader . . . was even alleged to have done." Tr. at 21; *see also* Pl.'s Resp. & Reply at 5 (arguing that Col. Bader's "specific punishment was [not] appropriately tailored to the specific ethical violation" he committed, and, therefore, the "AFBCMR committed an injustice by not correcting his record"). As discussed above, to the extent Col. Bader asks this court to review the merits of his Officer Grade Determination, the court may not do so. *See Murphy*, 993 F.2d at 874 (holding that in reviewing decisions of the military, the "invocation of the rubric 'injustice' provides no basis for judicial relief").

Moreover, when reviewing the AFBCMR's decisions under the arbitrary and capricious standard of review, the court does not "reweigh[] . . . the evidence," *Heisig*, 719 F.2d at 1157, and must defer to the credibility determinations made by the Board, *see Emoto*, 2017 WL 5167383, at *13. In this case, it was reasonable for the Board to conclude, based on the evidence in the record, that Col. Bader did not demonstrate an

error or injustice in the Officer Grade Determination decision based on the substantiated Inspector General report, despite his arguments that he never used his office for private gain, that he sought to comply with the ethics rules, and that the decision to reduce his rank was unwarranted.

The court acknowledges that Col. Bader strongly disagrees with the AFBCMR's failure to find that Col. Bader was treated unjustly. However, his disagreement with the Board's decisions is insufficient to demonstrate by "cogent and clearly convincing evidence," *Wronke*, 787 F.2d at 1576 (internal quotation omitted), that the decisions are arbitrary, capricious, or unsupported by substantial evidence. Col. Bader does not identify any precedent in his briefs that would support a different result. Here, the AFBCMR concluded that the Secretary of the Air Force's Officer Grade Determination for Col. Bader was not erroneous and did not rise to the level of injustice. After a review of the record, the court finds that the AFBCMR decisions are supported and reasonable.

**3. The AFBCMR adequately explained its decisions.**

Col. Bader next argues that the AFBCMR's decisions are arbitrary and capricious because they "rubber stamp[ed]" the advisory opinions obtained during the Board's proceedings without adequate explanation. Pl.'s Mot. at 13; Am. Compl. ¶ 60. The court again disagrees with Col. Bader.

In accordance with its own regulations, the AFBCMR must determine "in writing" whether an "applicant has demonstrated the existence of a material error or injustice." 32 C.F.R. § 865.4(h)(4). In doing so, this court has explained that correction boards must examine relevant data and articulate a satisfactory explanation for their decisions. *See,*

*e.g.*, *Gregory v. United States*, 151 Fed. Cl. 209, 237-38 (2020) (citing cases). While an explanation need not be set forth in "great detail," the "analytical path" must be reasonably discernable, *Volk v. United States*, 111 Fed. Cl. 313, 334 (2013) (internal quotations and citations omitted); *Sokol v. United States*, 120 Fed. Cl. 144, 151 (2015); *Peoples v. United States*, 87 Fed. Cl. 553, 576 (2009), and the Board must support its decision "with a reasoned explanation of an important issue," *Gregory*, 151 Fed. Cl. at 238 (internal quotation omitted), in a way that permits an applicant to "rebut [the Board's] action," *Peoples*, 87 Fed. Cl. at 553 (internal quotation omitted); *see also Boyer*, 323 F. App'x at 920 (explaining that "in military administrative decisions, the reasons need not be expressed in great detail" (internal quotation and alteration omitted)).

The court concludes that the AFBCMR has articulated an adequate explanation in this case in both is initial and reconsideration opinions. Starting with the initial decision, the Board, after reviewing Col. Bader's evidence and arguments, as well as the advisory opinions from the National Guard Bureau and the Personnel Council, "agree[d] with the opinion and recommendation of [the National Guard Bureau and the Personnel Council], and adopt[ed] their rationale as the basis for [its] conclusion that the applicant has not been the victim of an error o[r] injustice." AR6.

In this written opinion, the Board described Col. Bader's arguments and both advisory opinions. AR3-6. The National Guard Bureau's advisory opinion recommended denying Col. Bader's application based on the substantiated Inspector General findings. AR5. The Personnel Council advisory opinion recommended denying Col. Bader's application because Col. Bader failed to show that the Officer Grade

Determination was "erroneous, arbitrary, or unjust," because there "were no procedural errors in the [Officer Grade Determination] process," and because the Secretary of the Air Force "has wide discretion in making her determinations of satisfactory or unsatisfactory service and appropriately exercised her discretion in this case." *Id.*

The advisory opinions relied on by the Board responded to the information and arguments made in Col. Bader's application. Specifically, the Personnel Council found that Col. Bader's submissions to the AFBCMR did "not undermine the factual or rational basis of the decisions made throughout the [Officer Grade Determination] process, nor does it demonstrate that [Col. Bader] suffered an injustice." AR266. The Personnel Council explained that none of the information provided by Col. Bader to the AFBCMR was "new" or "indicative of innocence." *Id.* The Personnel Council went on to explain that, contrary to Col. Bader's arguments before the Board, the decision to terminate debarment proceedings against Col. Bader was not "exculpatory." *Id.* The Personnel Council also noted that the character letters submitted by Col. Bader to the Board could have been submitted during the Officer Grade Determination process but were not, and that these letters "did not provide any new or significant insight into the facts surrounding [Col. Bader's ethical] misconduct." AR267.

The Board's decision on reconsideration contains a similar analysis. After describing Col. Bader's submissions and the General Counsel's Office advisory opinion, the AFBCMR denied Col. Bader's reconsideration application. It concluded that "the Board remains unconvinced the evidence presented demonstrates an error or injustice. The Board concurs with the rationale and recommendation of [the General Counsel's

Office] and finds a preponderance of the evidence does not substantiate [Col. Bader's] contentions. Specifically, no new evidence presented rose to the level warranting this Board to overturn a thorough and valid [Inspector General] investigation, nor the decisions from senior . . . officials regarding [Col. Bader's] letter of reprimand and subsequent officer grade determination." AR10-11.

The General Counsel's Office advisory opinion relied on by the Board contains a review of Col. Bader's arguments on reconsideration, including his challenges to the underlying Inspector General report. AR404-14. Yet, the General Counsel's Office concluded that the Inspector General report "did not err in determining [Col. Bader] misused his official position and authority for personal gain and has found insufficient basis to conclude the Secretary of the Air Force's decision to direct [Col. Bader] be retired in the lower rank [of colonel] was unjust." AR404. In so concluding, the General Counsel's Office analyzed in detail the applicable facts and law, the Inspector General's investigation, and Col. Bader's arguments before the Board. AR404-14.

In reviewing the Board's decisions and the record, the court concludes that Col. Bader has failed to show that the AFBCMR's decisions are inadequately explained. While those decisions do rely on various advisory opinions, the advisory opinions themselves provide a discussion of the evidence in the record and the arguments submitted by Col. Bader. The AFBCMR was entitled to rely on these advisory opinions in drawing its conclusions, 32 C.F.R. § 865.4(a)(1), and the court finds that the AFBCMR, relying on these opinions, adequately explained the basis and rationale for its

decisions, *see Volk*, 111 Fed. Cl. at 334 (upholding a Navy corrections board decision relying on an advisory opinion).

For these reasons, the court finds that the AFBCMR adequately explained its denials of Col. Bader's applications. Col. Bader's argument to the contrary cannot serve as a basis for overturning the AFBCMR's decisions.

**4. Col. Bader has not shown how the AFBCMR violated his due process rights.**

Col. Bader next contends that the AFBCMR violated his due process rights.[8] Pl.'s Mot. at 14-15; Am. Compl. ¶ 60. However, the court agrees with the government that even if Col. Bader possesses a liberty or property interest in his rank, he has not shown that he was deprived of that rank without due process. "[D]ue process rights are typically fulfilled by notice of the government act and an opportunity to respond before or after the act." *Flowers v. United* States, 80 Fed. Cl. 210, 224 (2008) (quotation omitted). The record demonstrates that Col. Bader was given ample notice and the opportunity be heard on multiple occasions. Specifically, Col. Bader had the opportunity and did respond to (1) the letter of reprimand based on the Inspector General investigation, AR136; (2) the proposed Officer Grade Determination decision, AR177; and (3) the AFBCMR

[8] As stated above, the Court of Federal Claims lacks jurisdiction over claims alleging violations of the Due Process Clause because that clause is not a money-mandating provision. *See, e.g.*, *LeBlanc*, 50 F.3d at 1028. However, when a constitutional issue arises not as a standalone claim but as a factor to a claim properly brought under the Tucker Act, the court may exercise jurisdiction. *See Holley v. United States*, 124 F.3d 1462, 1466 (Fed. Cir. 1997) ("The presence of a constitutional issue does not erase the jurisdiction of the Court of Federal Claims based on a properly brought claim under the Tucker Act, or bar the court from considering the constitutional issue in the course of determining whether the discharge was wrongful.").

proceedings, where Col. Bader submitted briefs, supporting exhibits, and rebuttals to the advisory opinions obtained by the Board, AR18-263; AR269-363: AR376-92. In view of the foregoing, Col. Bader's claim that he was deprived of due process fails.

Col. Bader also argues that his substantive due process rights were violated because the decision to reduce his rank was "unjust." Pl.'s Mot. at 8, 15. In support, Col. Bader argues that the Officer Grade Determination was "egregious," "outrageous," and "shocks the conscious" because it was made in "bad faith" and was "arbitrary [and] capricious." *Id.* at 14-15 (quotation omitted). Col. Bader points to no evidence in the record of bad faith on the part of the Air Force. While Col. Bader clearly disagrees with the AFBCMR's decisions, he has not shown on this record that they are arbitrary or capricious or unsupported by substantial evidence.

**5. Col. Bader incorrectly argues that the AFBCMR's decisions should not be evaluated under the arbitrary and capricious standard of review.**

Finally, Col. Bader argues that the "AFBCMR has not entitled itself to Chevron-type deference in this case." Pl.'s Resp. & Reply at 5. Col. Bader seems be arguing that because the AFBCMR "acted in bad faith, . . . wholly disregarded the relevant evidence, and . . . failed to articulate a satisfactory explanation for its decision," the court should not apply the deferential arbitrary and capricious standard of review applicable to AFBCMR decisions. *Id.* However, it is well-settled that this standard of review applies here. *See, e.g.*, *Chappell*, 462 U.S. at 303; *Barnick*, 591 F.3d at 1377. As discussed above, the court disagrees with Col. Bader that the AFBCMR disregarded evidence or failed to articulate an adequate explanation for its decision. And Col. Bader has offered

no evidence that the AFBCMR acted in bad faith that would overcome the presumption of regularity afforded to AFBCMR decisions. *Richey*, 322 F.3d at 1326. This argument therefore cannot serve as a basis to overturn the AFBCMR's decisions upholding the Officer Grade Determination.

In sum, Col. Bader has not shown that the AFBCMR's decisions were arbitrary, capricious, unsupported by substantial evidence, or contrary to law. The court therefore grants the government's cross motion for judgment on the administrative record, and denies Col. Bader's motion for judgment on the administrative record.

## IV. CONCLUSION

For the foregoing reasons, the government's motion to dismiss, ECF No. 13, is **GRANTED IN PART** and **DENIED IN PART**. Col. Bader's motion for judgment on the administrative record, ECF No. 9, is **DENIED**. The government's cross motion for judgment on the administrative record, ECF No. 13, is **GRANTED**. For docket clarity, the Clerk is directed to **STRIKE** the response docketed at ECF No. 12, which was re-docketed at ECF No. 13 to correct a filing error. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge

FOUO: Working documents not to be released outside SAF/GC without express advance permission.

[redacted] CTR NG NGB ARNG

From: [redacted] CTR NG NGB ARNG
Sent: Thursday, April 19, 2012 10:11 AM
To: NGB-JA Ethics
Subject: FW: Cautionary Letter (UNCLASSIFIED)
Attachments: BG_Bader_COI_LTR_11.pdf

Follow Up Flag: Follow up
Flag Status: Completed

Classification: UNCLASSIFIED
Caveats: FOUO

-----Original Message-----
From: [redacted] 1STLT MIL US NG NGB ARNG
Sent: Thursday, April 19, 2012 10:09 AM
To: Bader, Daniel S BGEN MIL USA
Cc: [redacted] Ms CTR NG NGB ARNG; [redacted] MAJ MIL NG NGB ARNG
Subject: Cautionary Letter (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: FOUO

Sir,

Attached is a cautionary letter regarding a few assets and one position you listed on your 2011 OGE 278 report that are also DoD contractors. No action is required on your part at this time. Please do not hesitate to contact me if you have any questions or would like to further discuss your report.

V/r,

1st Lt [redacted]
Ethics Counselor
Contract, Fiscal Law, and Ethics Division Office of the Chief Counsel National Guard Bureau
[redacted]

CONFIDENTIALITY NOTICE:
This electronic transmission may contain attorney work-product or information protected under the attorney-client privilege, both of which are protected from disclosure under the Freedom of Information Act, 5 USC 552. Do not release outside of DoD channels without the consent of the originator. If you received this message in error, please notify the sender by reply e-mail and delete all copies of this message.

Classification: UNCLASSIFIED



FOUO: Working documents not to be released outside SAF/GC without express advance permission.

FOUO: Working documents not to be released outside SAF/GC without express advance permission.

NATIONAL GUARD BUREAU
1636 DEFENSE PENTAGON
WASHINGTON, DC 20301-1636

19 April 2012

NGB-JA

MEMORANDUM FOR Brig Gen Daniel Bader

SUBJECT: Cautionary Letter Concerning Current Assets and Position Listed on Your 2011 OGE 278 Report

1. You are required to file a public financial disclosure report. This office reviews these reports in accordance with applicable statutes and regulations. The reviewers examine the reports for conflicts of interest, completeness and consistency with previous reports.

2. We have carefully reviewed the report that you filed on 14 May 2011. Our review revealed no actual conflicts of interest; however, it did indicate that you currently hold the conflicting assets of **Abbot Labs, Anheuser-Busch Inc., Becton Dickinson Co., Chubb Security, Coca Cola, Exxon Mobil, General Electric, Genuine Parts Co., Honeywell, Johnson & Johnson, KLA-Tencor Corp., Kraft Foods, Merck, Proctor & Gamble, Tyco, Vodaphone, AT&T, Bank of America, Bristol Myers Squibb, Cisco, HJ Heinz, Pepsico Inc., Pfizer, Reddy Ice, and Verizon**, all DoD prohibited sources. You also hold the position of Consultant with **GMRE Inc.**, also a DoD prohibited source. These conflicts stem from the possibility that a matter involving these entities in which you have an interest, or one of their subsidiaries, could come before you in your official capacity. If such a matter does arise, you must immediately contact our office for an ethics review prior to taking action.

3. If you would like to discuss your financial disclosure report further, please feel free to contact me at [redacted]

FOR THE CHIEF COUNSEL, NATIONAL GUARD BUREAU:

[redacted]
First Lieutenant, USAF
Ethics Counselor

CF:
Chief Counsel, National Guard Bureau

FOUO: Working documents not to be released outside SAF/GC without express advance permission.

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing with the Clerk of the United States Court of Appeals for the Federal Circuit using the CM/ECF system this 14th of December, 2022, and that a copy was served on all counsel of record by the CM/ECF system.

December 14, 2022

*/s/ Jillian Sheridan Stonecipher*
Jillian Sheridan Stonecipher

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32 and the Rules of this Court. The motion contains 10,676 words, excluding the parts of the brief exempted by Federal Rules of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

December 14, 2022

*/s/ Jillian Sheridan Stonecipher*
Jillian Sheridan Stonecipher