# United States Court of Appeals for the Federal Circuit

---

**DANIEL BADER,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2022-2203

---

Appeal from the United States Court of Federal Claims in No. 1:21-cv-01501-NBF, Senior Judge Nancy B. Firestone.

---

Decided: April 1, 2024

---

JILLIAN STONECIPHER, Sidley Austin LLP, Washington, DC, argued for plaintiff-appellant. Also represented by CARTER GLASGOW PHILLIPS; CAROLINE A. WONG, Chicago, IL.

TANYA KOENIG, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by BRIAN M. BOYNTON, PATRICIA M. MCCARTHY, DOUGLAS K. MICKLE.

---

Before LOURIE, DYK, and STARK, *Circuit Judges*.

DYK, *Circuit Judge*.

Daniel Bader was a military officer who previously had held the rank of Colonel[1] but had attained the rank of Brigadier General at the time of his application for retirement in 2012. Following a finding that Col. Bader had violated 18 U.S.C. § 207(c) and 5 C.F.R. § 2635 and that his performance in the rank of Brigadier General was not "satisfactory," Col. Bader was retired at the rank of Colonel despite his attainment of the higher rank of Brigadier General. This determination affected his rate of retirement pay. Col. Bader brought suit in the Court of Federal Claims (Claims Court) for his allegedly lost pay. The Claims Court granted the government's cross-motion for judgment on the administrative record and denied Col. Bader's motion for judgment on the administrative record, finding that there was no error in the decision to retire him at the rank of Colonel. Col. Bader appeals. We affirm.

## BACKGROUND

### I

The sole issue in this case is whether Col. Bader was properly retired at the rank of Colonel or whether he should have been retired at the rank of Brigadier General, the highest rank he attained. This in turn affects the level of retirement pay to which Col. Bader is entitled. Under 10 U.S.C. § 1370 and Air Force Instruction (AFI) 36-3203, an "officer is not automatically entitled to retire in the highest grade held." AFI 36-3203 ¶ 7.6 (Sept. 18, 2015). "Instead, an officer is retired in the highest grade served on active duty satisfactorily . . . ." *Id.* Because the Air Force determined that Col. Bader's performance as

---

[1] Because Col. Bader was retired at the rank of Colonel, we refer to him throughout this opinion as Col. Bader.

Brigadier General was unsatisfactory, the Air Force determined that he was not entitled to retire at the rank of Brigadier General. *See id.* This finding was based on a determination that Col. Bader had violated ethical standards set forth in 18 U.S.C. § 207(c) and 5 C.F.R. § 2635.

First, the Air Force concluded that Col. Bader had violated 18 U.S.C. § 207(c). This provision imposes a "cooling off" period for former senior government officials, during which time they are forbidden from communicating with, or appearing before, their former agency with the intent to influence the agency on behalf of any other person. This restriction applies to anyone "employed in a position which is held by an active duty commissioned officer of the uniformed services" who is serving in a senior "grade or rank," including the rank of Brigadier General. 18 U.S.C. § 207(c)(2)(A)(iv). Col. Bader does not challenge the determination that he violated Section 207(c), admitting that he contacted members of the Air Force during his "cooling off" period in violation of this provision.

Second, the Air Force determined that Col. Bader violated 5 C.F.R. § 2635, which defines Standards for Ethical Conduct for Employees of the Executive Branch. Section 2635.702 of the regulation provides that "an employee shall not use or permit the use of his Government position or title . . . in a manner that is intended to coerce or induce another person, including a subordinate, to provide any benefit" to himself or any other person with whom the employee is affiliated in a nongovernmental capacity. 5 C.F.R. § 2635.702(a); *see also* 5 C.F.R. §§ 2635.702(d), 2635.101(a), (b). Col. Bader argues that the determination that he violated this provision was erroneous and that this error requires a judgment in his favor despite the admitted violation of Section 207(c).

The background leading to the Air Force's determinations is as follows.

## II

Col. Bader graduated from the United States Air Force Academy in 1985. Since that time, he has served many positions within the Air Force, including several staff positions at the National Guard Bureau (NGB). The National Guard Bureau "administers the federal functions of the Army and Air National Guard." *Air National Guard*, United States Air Force, https://www.af.mil/About-Us/Fact-Sheets/Display/Article/104546/air-national-guard/ (last visited Mar. 4, 2024). He also served as Commander of the Air National Guard/Air Force Reserve Command Test Center (AATC) in 2008 and 2009. He was promoted to the rank of Colonel in 2005 and to the rank of Brigadier General in August 2010. His service up until the time of his appointment as Brigadier General appears to have been exemplary. Col. Bader was awarded numerous service medals throughout his career and was consistently commended for his leadership.

The events in question occurred during his service as Assistant Adjutant General – Air, New York National Guard (ATAG-Air NYNG) from August 2010 until August 2012 when he held the rank of Brigadier General. During this period, because Col. Bader served as ATAG-Air NYNG in a part-time capacity, he was permitted to engage in outside employment. In September 2010, Col. Bader accepted a part-time civilian position with Gauss Management Research and Engineering, Inc. (GMRE) as their Vice President for International Programs, with full-time employment to begin in January 2011. Col. Bader's later positions at GMRE included Vice President of East Coast Operations and Executive Vice President of Operations.

GMRE is a veteran-owned business with its headquarters in South Ogden, Utah and is a member of System of Systems Security Consortium (SOSSEC). SOSSEC consists of a variety of organizations, including academic institutions and private companies. As a consortium,

SOSSEC provides the services of its member organizations to the government under Other Transactions Authority, which, as described below, is "a special vehicle used by federal agencies to obtain or advance research and development or prototypes." J.A. 168.

In 2011 and 2012, GMRE became aware of two government contracting opportunities. Col. Bader represented GMRE in attempting to secure these contracts, and GMRE was successful in obtaining both contracts. The 2011 contract concerned support for a division of the Air National Guard where Col. Bader previously served as Commander. The 2012 contract between the National Guard Bureau and GMRE awarded GMRE "end of year fallout funds for a GMRE study of [Remotely Piloted Aircraft Squadron Operation Centers.]" J.A 150. These Squadron Operation Centers provide ground operational support for Remotely Piloted Aircraft. The Air National Guard sought contractors to research ways to integrate the Operation Centers. The contract impacted the six Remotely Piloted Aircraft units in the Air National Guard across the nation, one of which was located in New York at the time when Col. Bader was serving as the ATAG-Air for New York.

In each instance, the contracting parties were GMRE and divisions of the National Guard Bureau. While Col. Bader was not directly responsible for negotiating the contracts on behalf of the National Guard Bureau at the time he represented GMRE in the negotiations, he was an officer of the Air National Guard and he dealt with Air Force officers during the negotiating process. This led to the two problems at issue here—the violation of the "cooling off" period statute, 18 U.S.C. § 207(c), and the violation of private gain regulation 5 C.F.R. § 2635, described in more detail below. An investigation was commenced by the Secretary of the Air Force, Inspector General.

III

Apparently, due to an Air Force reorganization, Col. Bader was required to be reassigned or to retire in 2012. He applied for military retirement and planned to retire on September 1, 2012. *Bader v. United States*, 160 Fed. Cl. 529, 536 (2022). On August 29, 2012, however, Col. Bader was notified that he was being investigated by the Inspector General due to alleged violations of ethics rules.

Then, on January 14, 2013, Col. Bader was informed of the specific alleged misconduct that formed the basis of the investigation. The first allegation was that Col. Bader, "by his actions while serving as an Air National Guard general officer and as an employee of [GMRE], violated post-government employment ethics restrictions as stated in Title 18, United States Code, Section 207." J.A. 171. The second allegation was that Col. Bader, "by his actions while serving as an Air National Guard general officer and as an employee of [GMRE], used his public office for private gain, in violation of 5 C.F.R. [§] 2635." J.A. 191. In April 2014, the Inspector General, in a Report of Investigation, determined that both allegations were substantiated.

On July 24, 2014, Col. Bader was sent a Letter of Reprimand by the Department of Air Force, Office of the Vice Chief of Staff. On September 25, 2014, the Director of the Air National Guard initiated a discretionary Officer Grade Determination for Col. Bader. On October 7, 2015, the Secretary of the Air Force, "after reviewing Col. Bader's 'entire military record of service, including the misconduct substantiated by an April 2014 Air Force Inspector General investigation' found that Col. Bader should be retired . . . in the lower grade of [C]olonel," as opposed to his

highest attained rank of Brigadier General.[2] *Bader*, 160 Fed. Cl. at 537. "A single incident of misconduct can render service in a grade unsatisfactory despite a substantial period of otherwise exemplary service," and the determination of "satisfactory or credible service" is a matter of Secretarial discretion. AFI 36-3203 ¶¶ 7.6.2.2, 7.6.2. On December 2, 2015, the Acting Under Secretary for Defense for Personnel and Readiness concurred with the Air Force's decision.

Col. Bader was notified of this decision on February 11, 2016. Col. Bader then petitioned the Air Force Board for Correction of Military Records (AFBCMR), asking that "(1) 'the [Inspector General's] Report Findings be overturned as to the substantiated allegation that he used his public office for private gain'; (2) 'that his retirement grade be restored and approved in the rank and grade of Brigadier General/O-7'; (3) 'retirement pay and benefits be directed and paid'; and (4) 'removal or modification of his military

---

[2] On November 4, 2014, the Office of General Counsel for the Secretary of the Air Force "initiated a federal contractor debarment action against Col. Bader based on the Inspector General report." *Bader*, 160 Fed. Cl. at 537. A debarment action "'is an administrative action which excludes nonresponsible contractors from government contracting' and 'effectuate[s] the [federal government's] policy that agencies shall solicit offers from, award contracts to, and consent to subcontracts with responsible contractors only.'" *Friedler v. Gen. Servs. Admin.*, 271 F. Supp. 3d 40, 43 (D.D.C. 2017) (quoting *Caiola v. Carroll*, 851 F.2d 395, 397–98 (D.C. Cir. 1988)). After Col. Bader responded through counsel, explaining that he failed to understand the requirements of the post-government employment regulations in Section 207(c) but that he accepted responsibility for those violations, the proposed debarment action was terminated.

records to comport with the Board's findings in [t]he interest of equity and justice.'" *Bader*, 160 Fed. Cl. at 538 (alterations in original) (citation omitted). In September 2017, a panel of the AFBCMR concluded that no error or injustice existed that would warrant the requested relief, relying on the Inspector General's Report. *Id.* Col. Bader filed for reconsideration in 2019, submitting additional evidence. The Board again found that no error or injustice existed. *Id.* at 539.

## IV

Col. Bader filed a complaint in the Claims Court in 2021, seeking to recover the original retirement pay he would have earned if he had been retired at the rank of Brigadier General. The court determined that 10 U.S.C. § 1370 was a money-mandating statute that supplied the court with jurisdiction under the Tucker Act. The Claims Court further concluded that Col. Bader had not demonstrated that the AFBCMR's decisions were arbitrary, capricious, unsupported by substantial evidence, or contrary to law. *Id.* at 549.

This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## Discussion

We review a decision of the Claims Court "granting or denying a motion for judgment on the administrative record without deference." *Barnick v. United States*, 591 F.3d 1372, 1377 (Fed. Cir. 2010); *see also Lewis v. United States*, 458 F.3d 1372, 1376 (Fed. Cir. 2006). Applying the same standard of review as the Claims Court, "we will not disturb the decision of the AFBCMR unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *Barnick*, 591 F.3d at 1377. In reviewing the decisions of the AFBCMR, we do not substitute our judgment for that of the military "when reasonable minds could reach differing conclusions on the same evidence." *Heisig v.*

*United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983). Relief from a corrections board decision will not be granted unless it is clear "by 'cogent and clearly convincing evidence that the correction board acted arbitrarily, capriciously, contrary to law, or that its determination was unsupported by substantial evidence.'" *Dodson v. United States*, 988 F.2d 1199, 1204–05 (Fed. Cir. 1993) (quoting *Arens v. United States*, 969 F.2d 1034, 1037 (Fed. Cir. 1992)).

## I

Regulation of the ethical standards of public officials has been a concern since the founding of our country. Daniel L. Koffsky, *Coming to Terms with Bureaucratic Ethics*, 11 J.L. & Pol. 235, 240 n.28 (1995).[3] As the government expanded over time in both size and function, the regulation of government employee conduct became more extensive. Notable was the Ethics in Government Act of 1978, Pub. L. No. 95-521, 92 Stat. 1824, following the events of Watergate, which, among other things, amended the

---

[3] Historical conflict of interest provisions include "(1) limits imposed on the Secretary of Treasury by the First Congress; (2) an 1853 prohibition on the prosecution by federal employees of claims against the government; (3) 18 U.S.C. § 216, which in 1862 barred federal employees from receiving consideration for taking or procuring contracts; (4) 18 U.S.C. § 434, which in 1863 barred federal employees from transacting government business with companies with which they had an interest; (5) 18 U.S.C. § 281, which in 1864 barred federal employees from rendering services for a fee in matters which the United States had an interest; (6) 5 U.S.C. § 99, which in 1872 imposed a two year ban on post-employment claims; and (7) the salary supplementation prohibition first enacted in 1917." Koffsky, *supra*, at 240 n.28 (citing Robert N. Roberts, White House Ethics: The History of the Politics of Conflict of Interest Regulation 7 (1988)).

existing post-government employment restrictions, required financial disclosures and established the Office of Government Ethics within the Office of Personnel Management. We are concerned here with two statutes enacted in 1962 and 1966.

In 1962, Congress enacted a statute, 76 Stat. 1119, to "simplify and strengthen the conflict laws presently in effect." S. Rep. No. 87-2213, at 4 (1962). Among other things, this statute continued the pre-existing restrictions on contacts between former senior officials and their agencies. *See, e.g.*, 18 U.S.C. §§ 203, 205, 207.

Additionally, 5 U.S.C. § 7301, enacted in 1966, authorized the President to "prescribe regulations for the conduct of employees in the executive branch." The Office of Government Ethics promulgated regulations that set out the Standards of Ethical Conduct for Employees of the Executive Branch, including the provisions at issue here. 5 C.F.R. § 2635. This regulation lays out the responsibilities of public service, delineating "general principles" that "requir[e] employees to place loyalty to the Constitution, the laws and ethical principles above private gain." 5 C.F.R. § 2635.101(a), (b). Among those general principles is that employees shall not use their public office for private gain. 5 C.F.R. § 2635.101(b)(7). Other provisions of the regulation reinforce this obligation. *See* 5 C.F.R. § 2635.702(a), (d).

### A. Violations of 18 U.S.C. § 207(c)

Col. Bader, a part-time general officer in the Air National Guard who was returned to active-duty status as needed, was a government employee subject to the "cooling off" restrictions of 18 U.S.C. § 207. Because Col. Bader was a "special Government employee," he was prohibited from "knowingly mak[ing], with the intent to influence, any

communication to or appearance before" his former[4] agency "on behalf of any other person . . . in connection with any matter on which such person seeks official action by any officer or employee of such department or agency," for one year following his last day of active service. This prohibition only applies if an officer serves in active duty for more than 60 days within the prior 365 days. If Col. Bader served in active duty status for more than 60 days within the prior 365 days, he was barred from contacting his former agency for one year. 18 U.S.C. § 207(c)(1), (c)(2)(B); *Bader*, 160 Fed. Cl. at 534. Due to Col. Bader's active duty service between 2010 and April 2012, he was in a "cooling off" period continuously from January 1, 2011, through April 10, 2013, and was prohibited from communicating with the Department of the Air Force during that time "on behalf of any other person." 18 U.S.C. § 207(c).

Col. Bader admitted that he violated these restrictions by communicating with the Air Force numerous times during this period. Despite being advised that he could not communicate with his former agency for a period of one year, Col. Bader "proceeded to engage" with this agency in his "governmental contractor capacit[y]." A.R. 369.[5] His frequent switches from "representation of the [Air National Guard] to representation of GMRE" created confusion among those he worked with, making it unclear whether

---

[4] The use of the word "former" does not fully describe the relationship between Col. Bader and the Air Force because he continued to be a part-time Air Guardsman with the Air National Guard. As a member of the Air National Guard, he was "periodically returned to active-duty status as needed." Appellant Opening Br. 7–8. We use the language "former" here consistent with the statutory language of 18 U.S.C. § 207(c).

[5] Citations to the administrative record ("A.R.") refer to *Bader v. United States*, 1:21-cv-01501-NBF, ECF No. 8.

he was representing the National Guard, the State of New York, or GMRE. A.R. 370. He would "communicate[] via email with Air Force and NGB officials to advocate for various contracting efforts—sometimes in his capacity as an [Air Force General Officer], and other times as a representative of his private employer." A.R. 366. He received a Cautionary Memo from the National Guard Bureau, Chief Counsel (NGB/JA) Ethics Counselor, warning him of potential conflicts of interest because of his concurrent military duties and work with GMRE, but he continued to "repeatedly contact[] members of AATC, NGB/A2, and NGB/A5 regarding the need for and award of a contract to conduct a [Remotely Piloted Aircraft Squadron Operations Centers] study." A.R. 367.

For example, Col. Bader "communicated with the Air Force by contacting AATC leadership on at least two occasions via email . . . regarding the use of SOSSEC as a contract vehicle and regarding a[] [Request for Research Project Proposal]." J.A. 190. He also "testified that he contacted several agencies, including the NGB, in an effort to identify business opportunities for GMRE." *Id.* Beyond these communications, he "advised and assisted the NGB in the development of a [Statement of Objectives] for a [Remote Squadron Operation Center ("RSOC")] study and directly supported the RSOC study after GMRE was awarded the contract." *Id.* Each time Col. Bader, with the intent to influence, communicated or appeared before his former agency during the "cooling off" period, he violated 18 U.S.C. § 207(c).

Col. Bader has accepted responsibility for his actions that led to the violation of § 207(c). J.A. 209. However, he contends that the denial of general officer retirement pay was based both on his violation of the cooling off statute, 18 U.S.C. § 207(c), and a violation of 5 C.F.R. § 2635 and cannot be sustained if we find that the AFBCMR's decision regarding the violation of 5 C.F.R. § 2635 was arbitrary and capricious or unsupported by substantial evidence.

### B. Violation of 5 C.F.R. § 2635

The primary alleged misconduct relates to a 2012 contract awarded to GMRE by the National Guard Bureau. The AFBCMR, in its initial decision, declined to provide relief, relying on the Inspector General's Report and advisory opinions from the Secretary of the Air Force and the National Guard Bureau as the basis for its determination that 5 C.F.R. § 2635 was violated. The improper conduct with respect to the 2012 contract falls into several categories.

#### Contract Drafting

The contemplated 2012 contract was to require that contractors prepare a baseline study about Remotely Piloted Aircraft Squadron Operation Centers. This study was necessary to bring the existing Operation Centers to a uniform standard, a standard which could then be used as a template for any new centers. In developing the Request for Research Project Proposal for the contract, the Air Force needed to write a Statement of Objectives to delineate the scope of the contract upon which contractors would then be able to bid. In June 2012, Col. Bader, working on behalf of GMRE, assisted the National Guard Bureau staff—the same organization where Col. Bader spent over half his time on active duty during this period—in developing and writing the Statement of Objectives for this contract. To assist with the drafting, Col. Bader, on behalf of GMRE, led a meeting with National Guard Bureau staff where they discussed the requirements of the proposal before the contract was awarded. He also provided a draft Statement of Objectives to the project manager of the contract. His actions caused concern among officers at the National Guard Bureau because, as one officer expressed, "at the end of the day, [the requirements] needed to be something that was defined by the government." J.A. 199. After helping set the scope of work with the National Guard Bureau, Col. Bader then helped draft GMRE's Response to the Research Project Proposal.

The Letter of Reprimand that Col. Bader received following the Inspector General's Report found "[p]articularly egregious . . . the action [Col. Bader] took to influence the scope of an NGB services contract and then writ[e] the response to the same contract on behalf of [his] civilian employer." J.A. 205.

Interactions with Subordinates

Col. Bader was found to have behaved unethically in requesting actions from subordinate officers designed to assist GMRE while its contract proposal was under consideration by the National Guard Bureau. Specifically, he was found to have "actively solicited and obtained the assistance of subordinate military officers to secure a contract on behalf of his employer, GMRE." J.A. 202. Having earlier provided career advice to a subordinate government officer (First Lieutenant Russo), Col. Bader sent her draft emails and asked her to forward those emails to contracting specialists within the government as if they came directly from her, regarding the same proposed GMRE contract award. The officer testified that Col. Bader's rank had influence on her, and she thought "it was a little odd" for him to be making this request. J.A. 196. She testified that she felt a "sense of trust" and an "intimidation factor" "given his position, given his rank." J.A. 196–97.[6]

Col. Bader enlisted the help of other subordinate officers as well in connection with the 2012 contract. Col. Bader

[6] As part of his motion for reconsideration, Col. Bader included a letter from First Lieutenant Russo. Col. Bader contends the AFBCMR failed to consider this letter and argues that this constitutes procedural error. We do not agree. This letter does not undermine her previous testimony but instead reaffirms it. First Lieutenant Russo is explicit that her "testimony to the IG [stood] and [she did] not wish to modify anything." A.R. 304.

contacted a subordinate officer on several occasions over the phone and by email regarding the drafting of the Statement of Objectives and the GMRE's Response to the Remotely Piloted Aircraft Squadron Operation Centers contract. On one occasion, after Col. Bader reached out directly to a government contracting specialist for information about an internal government funding deadline and was told to go through the proper channels to request such information, Col. Bader sent a draft email to two subordinate officers. In the draft email, he essentially made the same inquiry that he had just made to the contracting specialist but requested that the subordinate officers forward it to that same contracting specialist as if it came from the subordinate officers.

After GMRE was awarded the first phase of the Remotely Piloted Aircraft Squadron Operation Center contract, Col. Bader asked a subordinate officer to forward another draft email "to create the appearance that [he], a government employee, supported the award of follow-on phases to the [] project." A.R. 371. The subordinate officer did so, "despite the fact that he did not personally support follow-on funding for the project." *Id.*

Blurring the Lines Between Official and Civilian Status

The Secretary of the Air Force, Deputy General Counsel opined that "[b]y maintaining a continued official presence as an [Air National Guard General Officer] in a workplace that he also utilized as a government contractor" and by "engaging in his official capacity as an [Air Force General Officer] with individuals with whom he also did business as a government contractor," Col. Bader "perpetuated his mantle of authority" as a general officer and took advantage of those relationships to advance the interests of his private employer. A.R. 369.

In 2011 and 2012, Col. Bader "spent more than half of the time he was on orders . . . working issues with the [National Guard Bureau]," the same organization that "he

was . . . negotiating and facilitating profitable contracts with . . . on behalf of his private employer." A.R. 369. His status throughout that time was unclear; one day he might walk into the building in a uniform and be a superior officer; the next he would walk into the same building in a suit and contact the same individuals, purportedly in his civilian capacity.

Col. Bader also participated in a meeting at the Air Combat Command at which topics regarding Remotely Piloted Aircraft were to be discussed, including a briefing of the Squadron Operation Centers study—the same study that was the subject of the 2012 contract with GMRE. His participation drew concern from the NGB Director for Plans and Requirements. It was unclear whether Col. Bader was there representing GMRE or in his military capacity. He also "addressed [Air Force] officials by their call signs" when discussing GMRE business and "assumed the leadership position at the head of the table" during a meeting he had convened as a civilian contractor to discuss GMRE business on at least one occasion. A.R. 370.

The Inspector General "did not discover any evidence which indicated [Col.] Bader represented GMRE while on [active duty] as Brig. Gen. Bader." J.A. 201. However, even though Col. Bader did not take these actions on the days when he was on active duty, the Inspector General's Report of Investigation found "[t]he 'blurring' of [Col.] Bader's military and civilian statuses supports the conclusion that he used the authority derived from this [National Guard Bureau] general officer status . . . and gave rise to the appearance of a genuine conflict of interest." J.A. 201. The Report further found that the "appearance of impropriety was substantial." J.A. 203.

## II

While Col. Bader does not challenge the factual findings of the Inspector General's Report, he argues that

AFBCMR's decision should be set aside for several reasons, none of which has merit.

First, he argues that the failure of the criminal conflict of interest statute, 18 U.S.C. § 207(c), to specifically prohibit using public office for private gain means that such conduct is permissible. Appellant Opening Br. 42 ("By specifically defining impermissible conduct, Congress left no room for the Correction Board to create a broader prohibition under the military's general authority to prevent use of public office for private gain."). This specious argument finds no support in the statute. In fact, the legislative history of this statute explicitly recognized the fact there are other, additional means to regulate conduct in this area and that, because this area is regulated by a variety of mechanisms, the criminal statute need not address every aspect of possible employee conduct. S. Rep. No. 87-2213, at 13 (1962) ("The committee considers that the additional provision included by the House falls principally within the field of legal ethics, where the present Canons of Ethics would seem to give adequate coverage.") It was also noted that agencies promulgate their own regulations to govern conduct in addition to the statute. *Id.* at 10. Directly contradicting Col. Bader's argument that this statute was somehow meant to set the outer bounds of prohibited conduct, the statute was passed with the express awareness that additional regulations and ethics guidelines had governed and would continue to govern employee conduct.

Second, Col. Bader argues that he is being sanctioned solely because he held both civilian and military employment simultaneously, which is permissible. *See, e.g.*, Appellant Reply Br. 9 ("There is no real dispute that Colonel Bader was penalized for performing dual roles, as permitted under section 207."). Again, this argument is wholly without merit. The fact that an individual in military reserve status can hold civilian employment does not exempt that individual from ethical obligations. Col. Bader was denied retirement at his highest attained rank not because

he held two jobs at the same time, but because he violated the public trust by using his government position to benefit his civilian employer. The Inspector General's Report did not take issue with the fact that Col. Bader had concurrent employment as an Air National Guard general officer and as an employee of GMRE, but found that "by his actions while serving" in these roles, he violated 5 C.F.R. § 2635. His actions while serving created the violation, not merely the fact that he served in both capacities simultaneously.

Third, Col. Bader contends that, through "multiple ethics opinions," "the military advised Colonel Bader it was permissible for him to concurrently perform the dual roles which it later demoted him for performing." Appellant Opening Br. 45–46; *see also id.* at 1 ("[T]he military disciplined Colonel Bader and retired him at a lower rank for doing what the ethics opinions told him was permissible . . . ."). Col. Bader also argues that he could not have violated 5 C.F.R. § 7635.702, which requires a showing that the use of his government position was intended "to coerce or induce another person" to provide a benefit, because he was relying on the provided ethics opinions—and that reliance meant he could not have the requisite intent. Appellant Opening Br. 56.

This argument rests on a mischaracterization of the ethics opinions. The ethics opinions on which Col. Bader relies did not advise him that it was permissible to use the authority derived from his position as a general officer in a manner intended to benefit himself and his employer. Instead, the opinions advised Col. Bader of criminal statutes regarding conflicts of interest, 18 U.S.C. §§ 203, 205, 207, and the Federal Procurement Integrity Act, 41 U.S.C. § 423—all statutes that could be relevant to him during his post-employment period. While these opinions do not directly address the private gain regulations, they cannot remotely be read to advise Col. Bader that these regulations are inapplicable to him or that his improper conduct was permissible.

Furthermore, the "record reflects that the Board considered Col. Bader's arguments regarding his lack of intent," *Bader*, 160 Fed. Cl. at 545 n.7, and the Inspector General, in the Report of Investigation, found that Col. Bader acted "in a manner intended to induce others, including NGB military subordinates, to provide a benefit to himself and his employer." J.A. 201. Moreover, a finding of intent is not even necessary. The Inspector General's Report noted that "several portions of Title 5 of the Code of Federal Regulations are applicable to this allegation," and cited 5 C.F.R. § 7635.101(a) and (b) and § 7635.702(a) and (d) when describing the standards Col. Bader was alleged to have violated. Section 7635.702(d) is explicitly concerned with actions that could create an appearance of impropriety. Also, 5 C.F.R. § 7635.101(a) and (b) establish general standards for employee conduct and do not require specific intent.

Finally, Col. Bader contends that, because GMRE operates through an Other Transactions Authority, he was permitted to engage in this conduct. *See* Appellant Reply Br. 22 ("[A] contractor is permitted to do precisely what the military faulted Colonel Bader for doing here: work with the military to jointly define the scope of a contract by developing 'program objectives' and 'statement[s] of work.'"). The Other Transactions Authority provides a more diverse set of contractors the opportunity to partner with the federal government in research and development initiatives without needing to adhere to traditional government contracting requirements. This alternative acquisition method is useful particularly when it is necessary to work with organizations who have been reluctant to contract with the federal government due to its contracting requirements, specifically "concerning intellectual property rights and cost accounting standards." L. Elaine Halchin, *Other Transaction (OT) Authority*, CRS Report for Congress, 5 (Nov. 25, 2008), https://www.congressionalresearch.com/RL34760/document.php (available at J.A. 272).

Col. Bader points to the fact that the agreement between the government and his civilian employer, GMRE, was made pursuant to the Other Transactions Authority, so the Federal Acquisition Regulation did not apply. *See* 32 C.F.R. § 3.2 ("'Other transactions' are generally not subject to the Federal laws and regulations limited in applicability to contracts, grants or cooperative agreements. As such, they are not required to comply with the Federal Acquisition Regulation (FAR) and its supplements (48 CFR)."). Col. Bader is correct that the FAR does not apply to the Other Transactions Authority, but that fact does not help his argument. Col. Bader was not found to be in violation of the FAR or any other regulation that is "limited in applicability to contracts." 32 C.F.R. § 3.2. The Other Transactions Authority provisions do not exempt government employees from generally applicable ethics regulations. *See* John Cibinic, Jr. et al., *Formation of Government Contracts* § 1.02(d) (5th ed. 2023) ("When an agency uses its other transactions authority, it generally need not comply with the procurement statutes [or] the FAR," but it still "will be required to comply with any other statute of general applicability."). The Other Transactions Authority is not designed to promote self-dealing or to permit a public officer to use "his public office for private gain." J.A. 201.

## CONCLUSION

We agree that the government demonstrated that Col. Bader engaged in serious misconduct and the Claims Court properly granted the government's motion for judgment on the administrative record. The decision of the Claims Court is affirmed.

**AFFIRMED**